**STATE of Maine**

**v.**

**Clifford G. SMALL, III.**

Supreme Judicial Court of Maine.

April 21, 1966.

Franklin F. Stearns, Jr., Earl J. Wahl, County Atty., Portland, for plaintiff.

Casper Tevanian, Mahoney, Desmond, Robinson & Mahoney, by James R. Desmond and David G. Armstrong, Portland, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, SULLIVAN, MARDEN and RUDMAN, JJ.

TAPLEY, Justice.

On exceptions. The defendant, Clifford G. Small, III, was tried and convicted of the crime of robbery at the September Term, A.D. 1964 of the Superior Court, within and for the County of Cumberland. The case is before us on five exceptions. Exception #3 has been waived and, therefore, not considered by us. Counsel for respondent filed two motions, (1) motion for a directed verdict of not guilty; and (2) motion for mistrial; both of which were denied.

■ In his exceptions the defendant claims there was insufficient evidence to sustain, beyond a reasonable doubt, the identification of defendant as the assailant of Henry D. Thompson, the victim of the robbery; that the alleged admissions of the defendant were improperly admitted because they were made after the interrogation had entered the accusatory stage of the investigation without the defendant having been advised of his right to counsel and to remain silent. The exceptions also bring before this court the question of the presiding Justice allowing numerous questions propounded to a witness who refused to answer on the grounds of self-incrimination, claiming these questions under the circumstances were, in their nature, prejudicial to the respondent. Defendant further contends that the case lacks evidence of probative force proving that the defendant took money from the person of Thompson.

The evidence discloses that Henry D. Thompson at the time of the alleged robbery, on June 4, 1964, was an employee of a Portland hotel. He left his employment at 1:15 A.M. on June 4th and proceeded to his apartment which was located a short distance from the hotel. When he approached the door of the apartment house he was accosted by a man who asked him where "800 block was" whereupon Thompson directed him. Thompson further testified that he then walked up three stairs to the door leading into an apartment house, unlocked the door and went inside; that as he turned to shut the door it was pushed open by a man whom he later identified as the defendant and as a result of the pushing Thompson fell to the bottom of the stairs. He sustained injuries, from which he bled profusely. He finally got up to his apartment on the second floor and it was there he discovered that his right hand pant's pocket had been turned inside out and his money was not there. On June 8th Thompson was called to the police station where he found the defendant in custody and where he identified him as the person who assaulted him on June 4th.

During the trial of the case Thompson identified the defendant, as he sat in the courtroom, as the person who asked directions and later assaulted him.

There was no evidence presented to the jury on behalf of the defendant to contradict the testimony of Thompson. Thompson's testimony stands uncontradicted and unimpeached and the jury obviously accepted it as being true. Apparently the searching cross-examination of Thompson on the question of identification did not impress the jury.

■ Positive identification, if believed by the jury, is sufficient to warrant conviction. Pluckett, Jr. v. State, 234 Md. 536, 200 A.2d 74; Coates v. State, 232 Md. 72, 191 A.2d 579.

For a comprehensive treatment of the subject of identification, reference is made to the annotation in 71 A.L.R.2d, beginning on page 449.

■ The testimony of Mr. Thompson as to his identification of the defendant was competent, its probative force being for jury determination.

This exception has no merit.

The officers at the police station confronted the defendant with Mr. Thompson for the purpose of identifying, if possible, the defendant. Mr. Thompson testified as to events which occurred at the police station in the presence of the defendant.

Immediately upon being identified by Mr. Thompson, Small spontaneously, freely and voluntarily said, "I am sorry."

We emphasize the fact that the response, "I am sorry" was not the result of or in response to any question directed to the defendant by any officer or even by the complainant.

During the examination of Officer Joyce the following testimony was developed:

"Q. Did Mr. Small make any statements that time?

A. No.

Q. In the presence of you, Mr. Thompson, Captain Koshian, did Captain Koshian, or anyone else, ask Mr. Small whether or not he was responsible for this assault and battery?

A. We did.

Q. Who asked the question, if you recall?

A. I asked him.

Q. What was his answer to that?

＊　＊　＊　＊　＊　＊

A. He could not remember what he did that night because he had been drinking.

Q. That was the entire answer?

A. Yes."

Captain Kochian of the Portland Police testified, in part:

"Q. Hear any conversation between Mr. Thompson and Mr. Small at that time?

A. That wasn't the sequence. I asked Mr. Small if, what his answer was to Mr. Thompson's allegations. Small said: 'I can't remember. I was drunk.'

Q. Did Mr. Small, in your presence, say anything to Mr. Thompson directly, as you recall?

A. I can't recall that he said anything directly, but I asked Mr. Small if he knew where he was at the time this happened; if he did, to tell me and I would try to check it out and find out if his story was correct.

Q. What did he say to that?

A. He said: 'I can't remember too much. I was drinking.'

Q. You notice anything about the appearance of Mr. Small at that time regarding his hands?

A. There were some abrasions on his knuckles. I can't remember whether the right or left hand. I did ask him about the abrasions.

＊　＊　＊　＊　＊　＊

Q. What did he say?

A. He thought he got that in a fight with some Norwegian sailors, or something.

Q. At that time did Mr. Small have on the eye patch he has on now?

A. No, he did not.

Q. In your presence, did Mr. Small ever deny that he committed this act upon Mr. Thompson?

A. All he said, he couldn't remember, he was drinking, he couldn't remember where he was. He didn't actually deny it, nor did he say that he was guilty of it. As far as I can remember, all he said was he was drinking and he couldn't remember."

Counsel for the defendant contends that when Thompson identified the defendant as the person who assaulted him when his money was stolen the case entered the accusatory stage and that at that point the defendant was entitled to be advised of

his constitutional rights; that he should have been informed of his right to counsel and because this was not done any incriminating admissions or confessions would not be admissible against him.

Significantly incriminating admissions in criminal cases are to be considered in the same category as confessions and treated as such in determining their admissibility. Michaud v. State, Me., 215 A.2d 87.

In Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) the court said:

"We hold, therefore, *that where, as here,* the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' * * * and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (emphasis supplied).

Danny Escobedo had been arrested and brought to the police station for questioning about the murder of his brother-in-law. He was not at that time formally charged with a crime but he was in custody. He requested counsel. Escobedo's mother had previously engaged counsel who went to the police station. Counsel was refused the right to consult with his client as he was told that he could not see him until the questioning had been completed. Escobedo and his counsel were not permitted to consult with each other during the entire period of interrogation. Escobedo was not warned of his right to remain silent. After several

hours of interrogation Escobedo made certain admissions which implicated him in a plot to commit murder. The principles announced by the court in Escobedo are grounded on the above stated facts.

" * * * detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. But we cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated." Haynes v. State of Washington, 373 U.S. 503, 514, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963).

Under the influence of the particular circumstances of Escobedo the court announced the rule concerning interrogations wherein a distinction was made between investigatory and accusatory phases of the investigation. For the purpose of determining when constitutional rights came into play Escobedo has been cited throughout the country by defense counsel in numberless incidents where incriminating admissions or confessions have been made by defendants. As we read and interpret Escobedo we do not construe it as requiring release of *all defendants* who make incriminating statements resulting from police interrogation. The Supreme Court, in its opinion, considered defendant's constitutional rights based upon the particular factual circumstances found to be present in Escobedo.

"The narrow line between investigatory and accusatory questioning, * * *, is sometimes to be determined by whether or not the one questioned was treated with fundamental fairness considering all the circumstances of his questioning.

\* \* \* \* \* \*

"It is trial judges who, in the first instance must strike the necessary balance between permitting citizens to be free from criminal molestation and permitting individuals to enjoy the rights enumerated in the first ten Amendments to the Constitution. It will be a day of tragedy if any of the rights enumerated in the Bill of Rights are given such scope or meaning that the power of government to protect or enforce other constitutional rights of its citizens is rendered ineffective or the power of the government itself to insure domestic tranquility is destroyed. That is particularly true of the government that is historically a government of laws and not of men, a government dedicated in the language of the Preamble of the Constitution to 'establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, * * *.'" The Meaning and Scope of Escobedo v. Illinois by Hon. Robert Van Pelt, United States District Judge, District of Nebraska, 38 F.R.D. 441, 466.

We are not satisfied that when the police presented the respondent for confrontation and possible identification by the complainant, the investigation had shifted to the accusatory stage. Thus the spontaneous statement 'I am sorry', a statement most ambiguous and not in our view significantly incriminating, came at a time when its voluntariness was not impaired by any preliminary failure to give the warnings and advice with respect to silence and right to counsel discussed in Escobedo. In State v. Miranda (1965), 98 Ariz. 18, 401 P.2d 721, 730 (decided on other grounds) the court

used language with which we are in accord as follows:

"As to whether identification of a defendant in a 'line-up' is sufficient to focus the investigation upon a defendant depends upon all of the facts and circumstances surrounding the case. We call attention to the fact that the crime committed in the instant case occurred in the night time, and that there is always a chance of a mistake in identity under such circumstances on account of the excitement of the complaining witness, and difficulty of identity at night. Even where a complaining witness identifies a defendant in a 'line-up,' as in the instant case, officers may well feel that a defendant should have the right and privilege of explaining his whereabouts at the particular time which could be checked by the officers. One of the chief duties of both the sheriff's office and the county attorney's office is to make sure that people are not unjustly charged with crime. It is their duty to protect the innocent as well as detect the guilty."

The entire action took only a few moments. There were no promises, threats, coercion or violence inflicted upon the defendant to cause or influence the defendant to say, "I am sorry."

A careful reading of the majority opinion in Escobedo will demonstrate that the tests announced were predicated upon the factual circumstances obtaining in Escobedo. It is obvious that in the instant case the circumstances of the police interrogation are in no way comparable to those found to exist in Escobedo. It would be difficult to conceive of a case factually more remote from Escobedo than the case at bar.

Under the circumstances there can be no other determination than that the statement, "I am sorry" and the answers to the questions were voluntary and not the product of any unfair treatment by the officers. The record discloses no direct admission or confession by the defendant that he committed

the crime. The complete voluntariness of defendant's statements, as well as the totality of the circumstances, demonstrate no violation of defendant's constitutional rights which would have the effect of destroying the fact that his statements were the product of a mind free from any compelling influence on the part of the interrogators resulting in a violation of due process. The confrontation and inquiries which occurred at the police station were "threshold" in character, were investigatory rather than accusatory, and the events and conversations in connection therewith were properly received in evidence. Commonwealth v. Lepore, 349 Mass. 121, 207 N.E.2d 26 (1965).

The sum total of the circumstances in the instant case does not develop into a constitutional deprivation of defendant's rights.

■ The State presented as a witness one Richard Alfred Palmer. Mr. Palmer at the time he was called as a witness was serving sentence in Maine State Prison. Other than a few preliminary questions he refused to answer questions propounded by State's attorney for the reason, as stated in his own words: "I refuse to answer on the grounds it might incriminate me." During the course of a brief examination by the State the witness took advantage of his right under the Fifth Amendment thirteen times. Counsel for the defendant argues his position that to permit State's attorney to propound thirteen questions, resulting in the refusal to answer on the grounds of self-incrimination, was highly prejudicial to the rights of the respondent. For this reason the defendant contends that the refusal of the presiding Justice to grant a mistrial was error.

Counsel for the defendant lays great stress on Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 to sustain his position that the examination of Palmer by counsel for the State, when Palmer refused to answer the questions on the ground of self-incrimination, was prejudicial to the rights of the defendant. The factual circumstances of Douglas and the instant case are not at all analogous. In Douglas the prosecutor, under the guise of cross-examination, was asking questions of witness Lloyd from an alleged confession that Lloyd had made. The form of questioning continued until the entire document had been read. The prosecutor then called three officers who identified the document as embodying a confession signed by Lloyd. This alleged confession was identified as an exhibit but never offered in evidence. It is obvious that these tactics were prejudicial to Douglas. In the instant case no such circumstances obtain.

If, for any reason, the defendant was prejudiced by the type of examination, it was cured by the presiding Justice when he in his instructions to the jury referred to the refusal of the witness to answer on the ground of self-incrimination by saying:

"You will not, I instruct you with as much emphasis as I am capable, undertake to speculate upon what might have been his answers had he chose not to invoke the constitutionally guaranteed privilege against self-incrimination. The fact of the matter is, he did invoke such constitutional right; in doing so he was clearly within his rights. That is all there is to his testimony. You will not undertake to draw any inferences from anything he didn't say, because I instruct you, your conclusions must be based entirely upon legally admitted evidence, and he gave no evidence beyond stating his name, where he was, and where he once resided and a particular person whom he knew. That is all he said. He gave no other evidence. The questions which were asked him were asked in a form I ruled proper because of rules of law with which I need not enter into in a discussion on this case. You will not undertake to draw any inferences from the questions. The fact of the matter is that the questions were not answered, so disabuse your minds of any inferences which you could speculate might have resulted had the witness chosen not to invoke the provisions

of the Constitution guaranteeing against compulsory self-incrimination."

See United States v. Maloney, 2d Cir., 262 F.2d 535.

"The ordering of a mistrial is within the sound discretion of the presiding justice and exceptions will lie only to a clear abuse of that discretion." State v. Woods, 154 Me. 102, 103, 105, 144 A.2d 259.

See also State v. Norton, 151 Me. 178, 116 A.2d 635 and State v. Hamilton, 149 Me. 218, 100 A.2d 234.

■ It is to be noted that this objection does not raise a constitutional question.

We find no prejudicial error in the refusal to grant a mistrial.

■ The record shows sufficient admissible evidence to sustain the jury verdict of guilty.

The entry will be:

Exceptions overruled.

SULLIVAN, J., sat at argument but retired before the opinion was adopted.

WILLIAMSON, Chief Justice (dissenting).

I would sustain the exception to the refusal to grant a mistrial.

The State offered the witness Palmer who repeatedly refused to answer on the ground that he would thereby incriminate himself. The pertinent parts of the record are included herein. (1) In my opinion inferences which might reasonably be expected to be drawn by the jury from the examination of the witness were prejudicial and were not erased by the instructions to the jury.

For convenience I set forth certain bases for my reasoning:

First: The witness Palmer had the right under the circumstances to invoke the privilege by refusing to testify. The Court made it amply clear that Palmer was acting within his constitutional rights. Fifth Amendment, U. S. Constitution; Art. I, Sec. 6, Maine Constitution.

Second: The right to invoke the privilege was the right of the witness, and not the right of the defendant. I pass the question whether Palmer was properly considered a hostile witness subject to the techniques of cross examination. Hostility of a witness is not determined, as I see it, by the valid invoking of a constitutional right. My dissent, however, does not rest on this point.

Third: The State offered the witness to establish material facts bearing upon the defendant's guilt. Otherwise there would have been no purpose in placing him upon the stand. In short, if Palmer had answered the leading questions affirmatively, the State would thereby have added evidence of value, i. e. the substance of Palmer's statement to the police, to substantiate the charge against the defendant.

Fourth: The prosecution did not know when the witness took the stand that he would invoke the privilege.

As I read the record, shortly after the start of the direct examination the prosecution knew, or plainly should have known, that the witness would refuse to answer questions and would be within his constitutional right in exercising the privilege. I place this point at the refusal to answer whether he made a statement to the police, and surely no later than at the refusal to answer whether the statement was in connection with the defendant Small.

Thereafter the prosecution sought to get before the jury the substance of the statement not by admissible evidence but through the questioning.

It is said that the witness did not testify at all except in answer to a few innocuous questions (1). Strictly it is correct to say that a question with no answer, as here, equals no testimony. The root of our problem, I suggest, is deeper.

When the course the witness would pursue became apparent, the State, in my view, committed error in pressing the examination. I have no concern for the witness. He chose to remain silent, in the exercise of his privilege, and must bear whatever inferences we may care to draw from his conduct.

I am, however, unable to escape the conclusion that the repeated blows of the prosecuting attorney's leading questions forced home to the jury the points which the State unsuccessfully sought to extract from the lips of the witness.

If it be said that the jury did not know the examination was from a statement by the witness, it is sufficient, as I see it, to note the early inquiry about such a statement. Further, the Court said that "the County Attorney was reading the questions from a written and signed statement." The Court knew the fact, whether or not it was known to the jury; and the fact bears on the course and purpose of the questioning.

I conclude, therefore, that there was prejudicial error by the prosecution in the repeated questioning of the witness Palmer. The jury, quite naturally it seems to me, might infer that the prosecution was asking questions to which it had reason to expect affirmative answers, and that the witness was hiding facts harmful to the defendant.

Palmer's refusal to testify could not, of course, properly be the basis of findings against the defendant; and yet this may have been the result upon this record.

Was the prejudicial error in the examination cured by the charge? The instructions were unexceptionable. The Court did all that could be done at that stage of the case to remove the questioning of Palmer from the minds of the jurors.

I firmly believe that in most cases the Court may correct errors arising at trial by instructions to the jury, and that jurors "take the law" from the Court. There comes a point, however, at which fair minded men and women would find it difficult, if not impossible, to exclude from their minds the repeated leading questions directly bearing on guilt of the accused with the repeated refusal of the witness to testify on the ground of self incrimination.

I think the critical point was reached and passed in the case at bar.

In my view the case comes within the principle of Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). The differences in fact do not seem to me sufficient to make the principles here inapplicable. See also: Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724 (1964); United States v. Maloney, 262 F.2d 535 (CA-2-1959); Com. v. Granito, 326 Mass. 494, 95 N.E.2d 539 (1950); State v. Dinsio, 176 Ohio St. 460, 200 N.E.2d 467 (1964); Anno. 86 A.L.R.2d 1443.

The cases above, I add, give more weight to the effectiveness of the "curative charge" than do I on the present facts.

On reading again the record (1), I remain convinced that the shield against self-incrimination properly in Palmer's hands under both Federal and State Constitutions, became through error a sword in the hands of the State against the defendant; that the error was not cured by the charge; and that the defendant should be entitled to a new trial.

On the other issues in the case, I join in the opinion of the Court.

### (1)

### THE RECORD

At the request of the Court, the witness Palmer was advised of his constitutional rights by a member of the Bar. He was then called, sworn and testified as follows:

To each unanswered question he stated, "I refuse to answer on the ground that it might incriminate me".

"DIRECT EXAMINATION

BY MR. STEARNS: (County Attorney)

Q Speak right up, Mr. Palmer. State your full name.

A Richard Alfred Palmer.

Q How old are you?

A 26.

Q Where do you reside?

A Thomaston State Prison.

Q How long have you been in Thomaston State Prison?

A 22 days.

Q Where did you reside formerly to Thomaston State Prison?

A I was at 107 Sheridan Street and at 108 High Street.

Q When you lived at 108 High Street, did you live alone?

Q Now, on June 4th, 1964, did you have occasion to be in the Portland Police Station?

Q On that day, did you make a statement to the Portland Police?

Q Was this statement that I ask you about in connection with a case against Clifford J. Small, III?

Q On the night or the early morning hours of June 4th, 1964, was Clifford J. Small, III, in your car?

Q Do you know Clifford G. Small, III?

A Yes, sir.

Q See him in the Courtroom now?

A Yes, sir.

Q Point him out to the Jury.

A Gentleman right over there, sitting down. (Indicating)

Q Did you leave Clifford Small off at the corner of State and Congress Streets?

Q Did you see him later at the Forest City Diner?

Q Were you at the Forest City Diner about 1:30, 2:00 on the morning of June 4, 1964?

Q Did Clifford Small come into the Forest City Diner after you left him off uptown?

MR. TEVANIAN: (Counsel for Defendant) If Your Honor please, I submit this man has taken the Fifth Amendment. It seems to me my brother is using leading questions and getting to the Jury what he probably may have hoped this man's testimony would be. I object to the form of the questions.

THE COURT: I think under the circumstances the degree of leading being indulged in is permissible under the rules. Overruled.

Q I ask you, down in the Forest City Diner shortly after you left Mr. Small off uptown, did he give you some money?

MR. TEVANIAN: I would object, if Your Honor please, to the form of the question on the grounds that my brother is by his leading—

THE COURT: Overruled.

Q Did he give you some money down there?

Q Did you see any policeman down in the Forest City Diner?

Q Did you tell Mr. Small to go to the men's room down there that night because there were policemen outside?

*    *    *    *    *    *

Q While you were down at the Forest City Diner with Mr. Small at about

2:15 in the morning of June 4th, 1964, didn't he say to you he smashed a guy?

MR. TEVANIAN: I object, Your Honor, and I have a motion I would like to make at side bar.

THE COURT: Overruled. · The witness may answer.

MR. TEVANIAN: Might my objections be noted to all this line of questioning in this matter?

THE COURT: Certainly. I don't think you can do that under the rules. I think you will have to make them. Your objection to this question is noted.

Q Now, after you got back down in the Forest City Diner, did you notice anything wrong with Mr. Small's hand?

MR. TEVANIAN: I object.

THE COURT: Overruled.

MR. TEVANIAN: I have no questions. I would move the Court to instruct the Jury that all of the questions that were read into the record by my brother, the County Attorney, I would ask the Court to instruct the Jury they are to be disregarded and not to be construed in any form or manner as evidence in this case.

THE COURT: I don't think this is an appropriate time for requested instructions. At a more appropriate time, the circumstances of this witness will be described to the Jury.

\*    \*    \*    \*    \*    \*

(In Chambers without the hearing of the Jury the following took place:)

\*    \*    \*    \*    \*    \*

MR. TEVANIAN: I would like to make a motion for a mistrial that the questions read by the County Attorney are so harmful and prejudicial that they can't possibly be cured by a charge.

And the evidence is so weak it couldn't possible sustain a conviction.

THE COURT: I deny your motion for a directed verdict. I am sure, for the record, you do not suggest that the County Attorney's statements were without foundation. You are aware, I am certain, because you were shown the statement, that the County Attorney was reading the questions from a written and signed statement given by the witness at the Police Department at the time of his arrest, so it isn't a situation of a prosecutor who asks wild questions without any basis. I deny your motion for a mistrial."

FROM CHARGE TO JURY:

"In this case, also, a witness was called —I believe his name was Palmer. If I am correct in my recollection, he testified that at the moment he was an inmate of Maine State Prison. He testified as to his name, and in answer to a direct question testified that he knew this respondent. He was asked several other questions. In reply to those several other questions he responded in substance that he refused to testify on the grounds that to do so would tend to incriminate him. In common parlance, he invoked the provisions of the Fifth Amendment of the Constitution of the United States and the applicable provisions of the Constitution of Maine guaranteeing one against self-incrimination. In doing what he did, he was but exercising a constitutionally guaranteed right beyond giving his name, beyond stating that he once lived in Portland, or sometime lived in Portland—I think that is what he said —and beyond stating that he was presently an inmate at the Maine State Prison in Thomason, Maine, he gave no other testimony." [The remainder of the charge on this point is quoted in the opinion of the Court.]