Clifford G. SMALL, III, Petitioner,

v.

Allan L. ROBBINS, Warden Maine State
Prison, Thomaston, Maine,
Respondent.

Civ. No. 9-34.

United States District Court
D. Maine, S. D.

Aug. 5, 1966.

James R. Desmond, Portland, Me., for
petitioner.

John W. Benoit, Asst. Atty. Gen., State
of Maine, Augusta, Me., for respondent.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

The petitioner, Clifford G. Small, III, was convicted by a jury at the September 1964 Term of the Cumberland County, Maine Superior Court, of the crime of robbery. He was sentenced to 7½ to 15 years imprisonment in the Maine State Prison, and is presently in respondent's custody serving that sentence. On appeal, the Supreme Judicial Court of Maine, Chief Justice Williamson dissenting, affirmed petitioner's conviction, State v. Small, Me., 219 A.2d 263 (1966). He has now filed in this Court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 et seq. In his present petition, petitioner contends that his conviction was obtained in violation of his federal constitutional rights in two respects: (1) First, because there was received in evidence at his trial admissions which he made to the police without having been advised of his rights to counsel and to remain silent, in violation of the principles of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 94 (June 13, 1966); and (2) Second, because the State was permitted at his trial, by means of repeated leading questions to a witness who had refused to answer on self-incrimination grounds, indirectly to bring to the attention of the jury the substance of a written statement the witness had made to the police, in violation of the principles of Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

The parties have stipulated that petitioner has presented the federal constitutional questions which he now raises to the highest court of the State of Maine, and that, having obtained an adverse ruling from that court, he has exhausted his available State remedies as required by 28 U.S.C. § 2254. The parties have further agreed that petitioner's right to habeas relief in this Court be determined, without a further evidentiary hearing, upon the record of the proceedings at petitioner's trial and the opinion of the Supreme Judicial Court affirming petitioner's conviction.

For the reasons stated below, this Court is of the view that there is no merit in petitioner's first contention, but concurs with Chief Justice Williamson that petitioner's second contention must be sustained.

## I

The record so far as relevant to petitioner's first contention discloses the following: At 1:15 a. m. on June 4, 1964, Henry D. Thompson left his place of employment at a Portland hotel and walked to his apartment house, which was located a short distance away. As he approached the entrance to the apartment house, he was accosted by a man who asked him where the "800 block was." Mr. Thompson gave him the directions, and then walked up the three steps to the front door of the apartment house, unlocked the door and stepped inside. As he turned to close the door, it was pushed open by a man whom he later identified as the petitioner, and Mr. Thompson fell to the bottom of the stairs. He sustained injuries, from which he bled profusely, but finally climbed up to his apartment on the second floor. There he discovered that his right-hand pants pocket had been turned inside out and his money taken. On June 8, Mr. Thompson was taken to the Portland Police Station, where he was brought into a room in which petitioner was being held in custody and identified petitioner as his assailant. Immediately upon being identified by Mr. Thompson, petitioner spontaneously said, "I am sorry." In response to further questioning by the officers, petitioner stated that he could not remember what he had been doing on the night of the robbery, because he had been drinking. When the officers inquired about some abrasions on his knuckles, petitioner also said that he thought he got them "in a fight with some Norwegian sailors, or something." So far as the record discloses, petitioner at no time during his interrogation asked to consult with counsel, nor was he advised of his rights to counsel and to silence. At his trial the officers testified, over petitioner's objection, to the foregoing statements which he had made while in custody.

Petitioner's contention that the introduction in evidence of his in-custody statements violated his federal constitutional rights can be shortly disposed of. As indicated, he relies upon *Escobedo* and *Miranda*. But it is clear that *Escobedo* does not apply in this case, because no request to consult with counsel was made and refused. It is also clear that *Miranda* does not apply, because *Miranda* is not retrospective. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). In the language of the Court of Appeals for this Circuit,

> "Our task, therefore, is to apply a 'substantive test of voluntariness', drawing on pre-*Escobedo* and pre-*Miranda* case law on coerced confessions, to determine whether petitioner in this case has been 'found guilty by trustworthy evidence in conformity with previously announced constitutional standards.' Johnson v. New Jersey, supra." Kerrigan v. Scafati, 364 F.2d 759 (July 20, 1966).

Applying this test, this Court cannot find a shred of evidence in this record which indicates that the statements made by petitioner were the products of coercion or that his "will was overborne." Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The record conclusively demonstrates that petitioner's statements were "voluntarily given" and were not the result of "overbearing by police authorities." Id.

at 737, 86 S.Ct. 1761. Accordingly, this Court agrees with the Maine court that petitioner was deprived of no federal constitutional right by their admission in evidence at his trial.

## II

The facts relevant to petitioner's second contention are as follows: The State called as its last witness at petitioner's trial one Richard Alfred Palmer, a prisoner in the Maine State Prison. He stated his name, age, that he had been in the State Prison 22 days, and that he had previously resided at 107 Sheridan and 108 High Street (in Portland). He was then asked, "When you lived at 108 High Street, did you live alone?", and he answered, "I refuse to answer on the grounds that it might incriminate me." He was then asked the following questions, to each of which he made the same reply:

"Now, on June 4, 1964, did you have occasion to be in the Portland Police Station?"

"On that day, did you make a statement to the Portland Police?"

"Was this statement that I ask you about in connection with a case against Clifford J. Small, III?"

"On the night or the early morning hours of the, of June 4th, 1964, was Clifford J. Small, III, in your car?"

He was next asked whether he knew petitioner, to which he replied that he did, and he identified petitioner in the courtroom. The questioning then continued with the following questions, each of which the witness refused to answer on self-incrimination grounds:

"Did you leave Clifford Small off at the corner of State and Congress Streets?"

"Did you see him later at the Forest City Diner?"

"Were you at the Forest City Diner about 1:30, 2:00 on the morning of June 4, 1964?"

"Did Clifford Small come into the Forest City Diner after you left him off uptown?"

At this point, petitioner's counsel objected on the ground that the State was "using leading questions and getting to the Jury what he probably may have hoped this man's testimony would be." The court overruled the objection, and the State continued with the following questions, each of which the witness refused to answer on self-incrimination grounds:

"I ask you, down in the Forest City Diner shortly after you left Mr. Small off uptown, did he give you some money?"

(Petitioner's objection overruled.)

"Did he give you some money down there?"

"Did you see any policeman down in the Forest City Diner?"

"Did you tell Mr. Small to go to the men's room down there that night because there were policemen outside?"

"Did Mr. Small tell you he got $80 or $40?"

(Question withdrawn following petitioner's objection.)

"While you were down at the Forest City Diner with Mr. Small at about 2:15 in the morning of June 4, 1964, didn't he say to you he smashed a guy?"

(Petitioner's objection overruled.)

"Now, after you got back down in the Forest City Diner, did you notice anything wrong with Mr. Small's hand?"

(Petitioner's objection overruled.)

"Which one of you went over to the cashier and had a bill broken, down at the Forest City Diner?"

(Question withdrawn following petitioner's objection.)

At this point, the questioning stopped, and petitioner's counsel requested the court to instruct the jury to disregard and not to consider as evidence against petitioner the questions asked by the State, which the witness had refused to answer on self-incrimination grounds. The court refused to give the requested instruction at the time. The court also denied petitioner's motion for a mistrial, made on the ground that the questions

asked by the State of Palmer were "so harmful and prejudicial that they can't possibly be cured by a charge." However, in the course of his charge to the jury the trial judge said, referring to Palmer and his refusal to testify:

"You will not, I instruct you with as much emphasis as I am capable, undertake to speculate upon what might have been his answers had he chose not to invoke the constitutionally guaranteed privilege against self-incrimination. The fact of the matter is, he did invoke such constitutional right; in doing so he was clearly within his rights. That is all there is to his testimony. You will not undertake to draw any inferences from anything he didn't say, because I instruct you, your conclusions must be based entirely upon legally admitted evidence, and he gave no evidence, beyond stating his name, where he was, and where he once resided and a particular person whom he knew. That is all he said. He gave no other evidence. The questions which were asked him were asked in a form I ruled proper because of rules of law with which I need not enter into in a discussion on this case. You will not undertake to draw any inferences from the questions. The fact of the matter is that the questions were not answered, so disabuse your minds of any inferences which you could speculate might have resulted had the witness chosen not to invoke the provisions of the Constitution guaranteeing against compulsory self-incrimination."

It is clear from the record that throughout the questioning of Palmer, counsel for the State was holding in his hands and was formulating his questions from a written statement given by the witness to the police at the time of his arrest.[1]

■ On his appeal and in support of his present petition, petitioner argues that the foregoing procedure violated his rights under the Confrontation Clause of the Sixth Amendment as those rights have been recently declared and applied by the United States Supreme Court in Douglas v. State of Alabama, supra. A majority of the Maine court disagreed, holding that *Douglas* was distinguishable; that no constitutional question was presented; and that any prejudice which petitioner might have suffered was cured by the trial judge's charge. Chief Justice Williamson dissented on the ground that *Douglas* was plainly controlling; that petitioner suffered substantial prejudice by reason of the State's repeated questioning of Palmer after it knew, or should have known, that the witness would refuse to answer questions on valid self-incrimination grounds; and that the prejudice to petitioner was not cured by the charge.

Having reviewed with care the entire record of petitioner's trial, this Court concurs with the views expressed by the dissenting Chief Justice. As he observes, the State plainly should have known that the witness would refuse to answer further questions, probably when he refused to answer whether he had made a statement to the police, and certainly when he refused to say whether the statement was in connection with petitioner, and yet by following the procedure it did, the State was able to get before the jury the substance of Palmer's statement to the police in a manner which effectively denied to petitioner's counsel the right of cross-examination secured by the Confrontation Clause. As the Chief Justice further notes, Palmer's refusal to answer the repeated questions which the State was reading from his alleged statement to the police may well have led the jury "improperly (to) infer both that the statement had been made and that it was true," Douglas v. State of Alabama, supra 380 U.S. at 419, 85 S.Ct. at 1077, 13 L. Ed.2d 934, inferences which could not be tested by cross-examination. In the view of this Court, the present case falls, in

---

1. While the record is not clear in this respect, it appears that this statement had been marked for identification as State Exhibit 4, which the trial judge refused to admit in evidence.

this respect, squarely within *Douglas,* from which it is essentially indistinguishable.

Nor can this Court agree with the majority of the Maine court that the trial judge's charge cured the prejudice to petitioner from the type of examination which was used. In the words of the Chief Justice, this Court also

" \* \* \* firmly believe(s) that in most cases the Court may correct errors arising at trial by instructions to the jury, and that jurors 'take the law' from the Court. There comes a point, however, at which fair minded men and women would find it difficult, if not impossible, to exclude from their minds the repeated leading questions directly bearing on guilt of the accused with the repeated refusal of the witness to testify on the ground of self incrimination.

" \* \* \* (T)he critical point was reached and passed in the case at bar." Me., 219 A.2d at 270.

It is true that there is respectable authority which has held that a cautionary admonition by a trial judge to the jury can cure error which might otherwise be prejudicial to a defendant. See, e. g. United States v. Reincke, 354 F.2d 418, 420–421 (2d Cir. 1965); United States v. Maloney, 262 F.2d 535, 538 (2d Cir. 1959); Weinbaum v. United States, 184 F.2d 330, 331 (9th Cir. 1950); cf. Delli Paoli v. United States, 352 U.S. 232, 239–243, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); compare Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724, 726–727 (1964). However, it has also been recognized that such instructions impose upon the jury "a task beyond their powers: i. e. a bit of 'mental gymnastics,' as Wigmore § 2272 calls it, which it is for practical purposes absurd to expect of them." United States v. Maloney, supra (Learned Hand, J.). Moreover, in Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the Supreme Court recognized that, in determining whether a defendant's substantial rights have been affected in circumstances similar to those present in the instant case, the courts "have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error." 373 U.S. at 186, 83 S.Ct. at 1154. One of these grounds, the Supreme Court stated in *Namet,* relates to prosecutional misconduct, and the other "seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." Id. at 187, 83 S.Ct. at 1155. In the view of this Court, this is such a case. Thus, the present case is not one where the prejudice to petitioner from the denial of his right of cross-examination "constituted a mere minor lapse," Douglas v. State of Alabama, supra, 380 U.S. at 420, 85 S.Ct. at 1077, 13 L.Ed.2d 934, which was not substantial enough to justify a reversal. Cf. Fletcher v. United States, supra; United States v. Maloney, supra; compare Namet v. United States, supra; United States v. Amadio, 215 F.2d 605, 613–614 (7th Cir.), rev'd on other grounds, 348 U.S. 892, 75 S.Ct. 218, 99 L.Ed. 701 (1954); United States v. Hiss, 185 F.2d 822, 832 (2d Cir. 1950), cert. denied, 340 U.S. 948, 71 S.Ct. 532, 95 L. Ed. 683 (1951). As in *Douglas,* the information from Palmer's alleged statement which was brought to the jury's attention by the State's questioning "clearly bore on a fundamental part of the State's case against petitioner." 380 U.S. at 420, 85 S.Ct. at 1077. After reading this record, this Court, like the Chief Justice,

" \* \* \* remain[s] convinced that the shield against self-incrimination properly in Palmer's hands under both Federal and State Constitutions, became through error a sword in the hands of the State against the [petitioner]; that the error was not cured by the charge; and that the [petitioner] should be entitled to a new trial." Me., 219 A.2d at 270.

For the reasons stated, this Court holds that petitioner's conviction was obtained in violation of his rights under the Confrontation Clause of the Sixth Amendment, as applied to the States. Accordingly, the judgment of conviction and sentence imposed upon petitioner by the Cumberland County Superior Court is vacated, and the matter is remanded to that court to afford the State an opportunity to grant petitioner a new trial. In the event of the failure of the State to grant petitioner such relief within 60 days from the date hereof, the writ will be sustained and petitioner ordered discharged from custody.

The Clerk will enter an appropriate order in accordance with the foregoing, which order shall also provide that this Court shall retain jurisdiction of the present petition for the entry of such further orders as may be necessary or appropriate.[2]

**CANAL NATIONAL BANK, surviving Executor and Trustee under the Will of Frank B. Emery, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 8-144.**

United States District Court
D. Maine, S. D.

July 25, 1966.

---

**2.** Petitioner has been ably represented in these proceedings by his State court-appointed counsel, James R. Desmond, Esq., of Portland, Maine.

Raymond E. Jensen, George J. Mitchell, Donald G. Lowry, Portland, Me., for plaintiff.

Lloyd P. LaFountain, U. S. Atty., Portland, Me., Rufus E. Stetson, Jr., Tax Division, Dept. of Justice, Jack S. Levin, Washington, D. C., for defendant.

GIGNOUX, District Judge.

Plaintiff is the surviving executor and trustee of the estate of Frank B. Emery.

It brought this action for refund of $6,157.86 federal income taxes, and assessed interest in the amount of $929.84, paid under protest for the fiscal years ended March 31, 1961, 1962 and 1963.[1] The question presented is whether plaintiff is entitled to charitable deductions for undistributed capital gains in the years involved as income permanently set aside for charitable purposes within the meaning of Section 642(c) of the Internal Revenue Code of 1954, 26 U.S.C. § 642(c).[2]

Frank B. Emery died testate on May 3, 1959. After making certain specific bequests and creating a marital trust of one-half of his adjusted gross estate, the decedent, in Clause Fourth of his will, left the residue of his estate in trust, to pay the net income to his wife, Catherine F. Emery, for life.[3] Clause Fourth of the will further provided that, upon Mrs. Emery's death, the trustees were

" * * * to make the following payments from the income (of the trust):

"A. To my nephew, Clarence L. Emery, the sum of Two Hundred Dollars ($200) monthly so long as he may live,

1. The jurisdiction of this Court is based upon 28 U.S.C. § 1346(a) (1).

2. Section 642(c) of the 1954 Code provides as follows:

(c) *Deduction for amounts paid or permanently set aside for a charitable purpose.*—In the case of an estate or trust (other than a trust meeting the specifications of subpart B) there shall be allowed as a deduction in computing its taxable income (in lieu of the deductions allowed by section 170(a), relating to deduction for charitable, etc., contributions and gifts) any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is, during the taxable year, paid or permanently set aside for a purpose specified in section 170(c), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit. For this purpose, to the extent that such amount consists of gain from the sale or exchange of capital assets held for more than 6

months, proper adjustment of the deduction otherwise allowable under this subsection shall be made for any deduction allowable to the estate or trust under section 1202 (relating to deduction for excess of capital gains over capital losses). In the case of a trust, the deduction allowed by this subsection shall be subject to section 681 (relating to unrelated business income and prohibited transactions).

3. In Clause Fifth of his will Mr. Emery also authorized his trustees to make payments to his wife from the principal of the trust if at any time during her life they were of the opinion that the trust income was not sufficient for her "proper support and maintenance." The government concedes that this provision for invasion of principal for the wife's benefit does not make the gift to charity so uncertain as to defeat the claimed charitable deductions. Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929); Blodget v. Delaney, 201 F.2d 589 (1st Cir. 1953); Isaacson v. Clauson, 95 F.Supp. 482 (D. Me.1951). See n. 11, infra.

and after his death, One Hundred Dollars ($100) monthly to his wife, Helen Williamson Emery, for her life, or until her remarriage, and the sum of Fifty Dollars ($50) monthly to his daughter, Ruth Evvie Emery, for her life, and the sum of Fifty Dollars ($50) monthly to his daughter, Eleanor Jean Emery, for her life. On the death of their mother, she having survived their father, or on his death, if their mother does not survive him, said monthly payments to my said two grandnieces shall be increased to One Hundred Dollars ($100) each, and I further authorize my Trustees to pay such increased payments during the lifetime of their mother, if necessary, in the sole discretion of my Trustees, to provide for their comfortable support and maintenance, including extraordinary bills for medical or hospital care and nursing.