**STATE of Maine**

v.

**Paul A. LAFFERTY.**

Supreme Judicial Court of Maine.

Sept. 11, 1973.

Fernand LaRochelle, Asst. Atty. Gen., Augusta, for plaintiff.

Irving Friedman, Lewiston, for defendant.

Before WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

ARCHIBALD, Justice.

The appellant was indicted for the murder of his estranged wife, Teresa Lafferty. The jury determined by its verdict that he was, in fact, guilty of murder, and the case is now before us on appeal. We deny the appeal.

Our review of the issues raised on appeal must be considered in three general-ized categories, namely, errors arising from the rulings of the Justice below on motions to suppress certain evidence; errors committed during the actual trial; and, finally, alleged errors contained in the instructions to the jury.

The record before us is lengthy and counsel for the appellant was meticulously careful to preserve for appellate review each point which he felt might constitute reversible error. While we must consider all of the points thus saved for review, we have consolidated many of them because the same general legal conclusion becomes dispositive of these points.

*Facts*

Teresa Lafferty and her husband had become estranged and at the time of this episode Mr. Lafferty was living in Lewiston, employed in a mechanical capacity, and his wife in Wilton, working as a cashier in a supermarket. For a period of several weeks prior to April 29, 1971, Mrs. Lafferty and her husband had made periodic efforts at reconciliation. Mrs. Lafferty had a daughter (Terry) by a prior marriage, for whom the appellant claimed paternal affection.

In the general vicinity of 9:00 p. m. on April 29, 1971, Mrs. Lafferty, accompanied by her sister, drove into a parking lot in the town of Jay which was utilized by the "Caledonia Lounge" for customer parking. A bartender employed at this lounge was likewise in this parking lot and observed what appeared to him to be a violent altercation between a man and a woman, subsequently proved to be the appellant and his wife. He ran to call for help and on returning he observed the exit of the appellant, describing it as follows: "He jumped in his car and took off very fast." He next observed Mrs. Lafferty lying on the ground "all covered with blood." He immediately ran back to the lounge to get some napkins and on his prompt return and while he was holding her leg to stay the flow of blood, she said: "My God, I knew

he'd do something like this. Please take care of my child."

Another witness, who described Mrs. Lafferty's condition at this time, used this language: "The girl was moaning and screaming that her wound pained her and she appeared to be in great pain."

An ambulance arrived shortly and the victim was taken to a hospital in Farmington. Upon the subsequent arrival of the police, the area was searched and a press photographer found a hunting knife in a grassy area within a few feet from where Mrs. Lafferty had been lying. This was recovered and delivered to the investigating officers and ultimately was introduced at trial. It is allegedly the weapon that caused her death.

Mrs. Lafferty was in critical condition but rational when she arrived at the hospital. Emergency medical treatment was immediately rendered, followed by an operation (a left oracostomy) at approximately 11:00 p. m. The surgeon detected severed intercostal arteries which he ligated, and after a massage of her heart Mrs. Lafferty responded. However, in about one-half hour hemorrhaging recurred and medical efforts to revive her failed. She was pronounced dead at approximately 1:45 a. m. An autopsy revealed an actual count of twenty-three non-surgical wounds which were consistent with having been inflicted by the hunting knife. A pathologist attributed the cause of death to "acute blood loss" resulting from "wounds by a sharp instrument."

Shortly after Mrs. Lafferty was removed to the hospital police investigation began and, based upon information obtained both at the scene and in the hospital, a radio message was transmitted requesting the apprehension of the appellant. This message was received by the Lewiston Police Department as well as the Androscoggin County Sheriff's Department, and an immediate effort was made by both departments to locate Mr. Lafferty, initial-

ly at 67 Shawmut Street, where he had lived until April 27, 1971.

As the result of a telephone call received by the police at approximately 12:20 a. m. (April 30, 1971), a Deputy Sheriff and two members of the police department convened at another Lewiston address, 17 Elliot Street. There, after some conversation with a Mr. and Mrs. Beaulieu who were the actual occupants of an apartment at this address, these officers observed Mr. Lafferty leave the apartment and enter an automobile which they had observed parked in a driveway and which matched the description previously given them by police radio communication. As the officers approached, Mr. Lafferty got out of the car, walked towards them and said, "I give up. I'm not armed." He was immediately frisked, handcuffed, and placed in the police cruiser. Previous to leaving for police headquarters, one of the officers took the key from the vehicle and, without making any search or observation of its contents, locked it.

At that point in time it is fair to say that none of the officers was personally aware of the precise charge for which this arrest was being made. The officers said nothing to Mr. Lafferty, nor did they give him any warning or advice. They described Mr. Lafferty as being sober.

En route to the police station appellant made a statement to the police. One officer testified as follows:

"One of the statements, his first statement, was that he inquired as to the condition of his wife. We advised him that we did not have this information available. We did not know. Then he made the statement, 'I know I got her twice with a knife, once on the stomach good, and once when she fell down.'"

Mr. Lafferty was held briefly at the Lewiston Police Department and was then transported to the Androscoggin County Sheriff's department where he was later interviewed by a Maine State Police De-

tective. The so-called Miranda warnings were given, following which the appellant personally wrote out a four-page statement inculpating himself in the death of his wife. This statement was ultimately admitted in evidence. Additionally to the written statement, the police detective was allowed to testify as to verbal statements made by Mr. Lafferty in explanation of certain ambiguities apparent from reading the written statement. The written statement described the stabbing in this language:

"[M]y wife start toward my car as she did I know she would run I drew my kife she saw it and panic when did I stabbed her she didn't know it till got to my car said get in was on passeger side she started to and ran again about 3 ft I stabbed her in back and right said and then I went crasy as by me said stop and she was laiding she try to call Elaine and I was get back in car she moved and look at me when back and stabbed her 3 or 4 time more in Back this time she roll over I turn back I think I hit her neck or ear with my kife and look at her just look at me and moaned and I got in car and drove out fast . . . ."

After the appellant had finished writing the statement, the Detective interrogated the appellant for the purpose of explaining away the ambiguities arising from poor English, lack of punctuation and misspelling. The officer was allowed to testify as to the explanation given him by Mr. Lafferty of these ambiguities. The result of the explanation was a clear statement in which the appellant admitted the fatal stabbing of his wife by the use of a hunting knife.

Shortly after the Lewiston police had delivered Mr. Lafferty to their headquarters, they returned to the locked vehicle at 17 Elliot Street. With the aid of a flashlight they observed what appeared to be blood stains on the exterior of the door on the driver's side in the vicinity of the door handle. They also observed clothes hanging over the back of the front seat on which there appeared to be blood stains. They then unlocked the car (the key having been in their possession since the arrest) and drove it to the garage maintained by the Androscoggin County Sheriff's Department. Subsequently, a search warrant was obtained, the car opened, its contents photographed, the clothing removed, and the suspect blood spots scraped from the car door and preserved.

### Alleged Errors in Ruling on Motion to Suppress

Prior to the trial a motion to suppress was filed. This motion was directed at the suppression of evidence taken from the automobile and the several statements made by the appellant to the police officers.

The Justice below refused to suppress any of the physical evidence. He held that the officers had probable cause for the arrest, that the seizure of the automobile was not only incident to a lawful arrest but necessary to preserve evidence and "incidentally to protect defendant's property." In any event, he held that the search warrant was validly issued and executed.

With reference to the oral statements made in the police car immediately following the arrest, the Justice below said, "I am satisfied beyond a reasonable doubt that they were voluntary and admissible even though no prior warnings were given."

He also ruled that the defendant's written statement and his oral explanation thereof were admissible because he was satisfied "beyond a reasonable doubt" that the Miranda rule had been complied with and that the statements were entirely voluntary.

We consider first those issues generated by the denial of the motion to suppress.

■ Initially, we concern ourselves with the question of whether the arrest itself was valid. The argument is advanced that

the subsequent seizure of the contents of the automobile, the statement made en route to the police station, and the signed confession were all the products of an unlawful arrest and, therefore, this entire block of evidence should have been suppressed.

The resolution of this issue rests, not necessarily upon the knowledge of those police officers who physically arrested the appellant, but rather upon the collective police knowledge extant at that time. We must consider whether within the gamut of general police knowledge focused at shortly after midnight on April 30, 1971, there was *probable cause* to believe that the appellant was guilty of felonious conduct. Otherwise stated, if the totality of police knowledge then in existence had been presented to a magistrate in a request for a warrant of arrest, would it have been obtained?

When the appellant was arrested the record indicates composite police knowledge which, omitting numerous but less important details, includes the following:

(1) Mrs. Lafferty was the victim of a potentially fatal stabbing, a hunting knife being the weapon involved.

(2) She had made a statement (admissible either as a dying declaration or under the res gestae rule; *see infra*) which indicated that her husband was the assailant.

(3) The vehicle beside which the appellant was arrested matched the vehicle described as the appellant's.

(4) From the testimony of Wendell Beaulieu, the actual occupant of the apartment at 17 Elliot Street, the inference is clear that the police knew of the appellant's presence in this apartment.

(5) Mr. Lafferty's statement prior to his arrest, "I give up. I'm not armed," was, in terms of this police knowledge, tantamount to an admission of complicity on his part.

This Court has recently given complete consideration to the rules defining the circumstances under which probable cause may be found in making a warrantless arrest.

"Probable cause must be judged on the basis of the composite information in possession of the police and if that knowledge in its *totality* shows probable cause, a policeman who makes the arrest upon an order to do so under such circumstances, acts upon probable cause. . . ." (Emphasis supplied.)

State v. Smith, 277 A.2d 481, 489 (Me. 1971); *see also* State v. Mimmovich, 284 A.2d 282 (Me.1971).

We have no hesitancy in ruling that the arrest of the appellant was valid.

The appellant, however, urges that the Justice below was in error in failing to suppress the articles of clothing and the blood scrapings taken from the vehicle in the execution of the search warrant.

█ We note that the automobile was not actually searched nor were its contents seized until some hours had elapsed after it was taken into police custody. In the interim a police officer, with the aid of a flashlight, had observed relevant evidence in plain view. This type of observation is not an intrusion into a constitutionally protected area. State v. Stone, 294 A.2d 683, 688 (Me.1972).

█ Without necessarily having to deal with the problem of whether the police acted properly in, first, locking the car and, secondly, removing it from the driveway to the Sheriff's garage,[1] it was at the garage that it was ultimately photographed and searched and the bloody clothing and blood scrapings were there seized. At this point in time the police were in possession of and were executing a validly issued search warrant. We see no useful purpose in repeating the contents of the affidavit filed

---

1. See also Cady v. Dombrowski, —— U.S. ——, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

in support of the request for the search warrant. Suffice it to say, that on its face it recited adequate and obviously reliable facts sufficient to underlie the issuance of a search warrant.[2] State v. Cadigan, 249 A.2d 750 (Me.1969).

■ The appellant was in no way prejudiced by the security taken of his automobile by the police pending the issuance of the search warrant. So far as the generation of the evidence is concerned, the car could have as well been searched at 17 Elliot Street as in the Sheriff's garage.

The appellant made four inculpatory statements which were not suppressed, the first prior to his arrest, the next en route to the police station, the written statement, and the verbal explanation thereof.[3]

It will be recalled that after his arrest and while in the police car, Mr. Lafferty first inquired about his wife's condition and then said, *without being questioned*, "I know I got her twice with knife, once on the stomach good, and once when she fell down." The Justice below found beyond a reasonable doubt that this statement was voluntary.

■ The decisions seem uniform that spontaneous or voluntary statements *which are not the product of custodial interrogation* are admissible without prior Miranda warnings, even though made while under arrest. Chief Justice Warren, speaking for the majority of the Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), limited the impact of the decision by stating:

"Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

2. We note that the affidavit in support of the warrant does not recite the flashlight observation of the exterior and interior of the vehicle.

3. A fifth statement was made several days later while appellant was being transferred

384 U.S. at 478, 86 S.Ct. at 1630.

In situations factually similar to those before us, voluntary statements made to police officers either without prior Miranda warnings, or with ineffective or incomplete warnings, have been held admissible in many jurisdictions. We have found no precedent holding otherwise.

In a pre-Miranda trial, a voluntary but inculpatory statement to a coroner was admitted. State v. Hymore, 9 Ohio St.2d 122, 224 N.E.2d 126 (Ohio 1967), cert. denied, 390 U.S. 1024, 88 S.Ct. 1409, 20 L. Ed.2d 281; *see also* State v. Small, 219 A. 2d 263, 267–268 (Me.1966).

Subsequent to the date when the Miranda rule was made applicable to criminal prosecutions (June 13, 1966) in allowing the testimony of a police officer reciting a voluntary statement made to him by a juvenile under arrest for a felony, the Illinois Court said:

"All agree that Miranda does not require police to interrupt a suspect in the process of making a spontaneous statement in order to warn him of his constitutional rights, and that a statement made in the absence of any questioning is not inadmissible by virtue of the failure to give such warning."

In Re Orr, 38 Ill.2d 417, 231 N.E.2d 424, 427 (Ill.1967), cert. denied, 391 U.S. 924, 88 S.Ct. 1821, 20 L.Ed.2d 663.

In a case almost "on all fours" with the one before us, the Oklahoma Court reached the same conclusion. Andrews v. State, 455 P.2d 741 (Okl.Cr.1969).

While a suspect was under arrest and before the Miranda warning had been completed, the defendant interjected a damaging admission. Since it was not the result of police interrogation, and was volun-

from the Androscoggin County Jail to the Franklin County Jail. Because of inadequate and incomplete Miranda warnings at that time, this statement was suppressed.

teered, it was held admissible. Richardson v. State, 6 Md.App. 448, 251 A.2d 924 (1969); *see also* Campbell v. State, 4 Md. App. 448, 243 A.2d 642 (Md.1968).

Louisiana has held that a spontaneous and voluntary statement made without solicitation, even though while under arrest, is not made inadmissible because of the lack of a prior Miranda warning. State v. Richey, 258 La. 1094, 249 So.2d 143 (1971).

Two Federal Circuits, on facts remarkably similar to those before us, have reached the same conclusion. United States v. Littlejohn, 441 F.2d 26 (10th Cir. 1971); Klamert v. Cupp, 437 F.2d 1153 (9th Cir. 1970).

◼ In holding that the statement made to the Lewiston police by the appellant after his arrest and while en route to the police station was properly admitted by the Justice below, we quote the language of the Arkansas Court:

"We do not take Miranda to mean that a man cannot voluntarily open his mouth."

Hammond v. State, 244 Ark. 1113, 428 S. W.2d 639, 645 (1968).

◼ Our holding on this point has obvious bearing on the appellant's statement to the police *prior* to his arrest, namely, "I give up. I'm not armed." The Justice below correctly ruled it admissible. *See* Annot., 31 A.L.R.3d 676, § 29, for illustrative cases.

Appellant bottoms his attack on the admissibility of both the signed confession and his subsequent explanatory oral statement on three decisions of the United States Supreme Court, Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338 (1967); and Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968).

These cases address themselves to the issues of voluntariness, ruling in each case that the inculpatory statements taken were not products of the free wills of any of those being interrogated.

In *Garrity,* police officers were questioned concerning irregularities in the handling of cases in municipal courts. Noting that these officers were given the choice of forfeiting their jobs or incriminating themselves and, likening it to a ·choice "between the rock and the whirlpool," the Court held that the waivers of Fifth Amendment rights were the results of duress.

After finding that the prisoner had never been fully advised of his Fifth Amendment rights during nine days of incarceration, that his original arrest was not supported by probable cause and that the "record inspires considerable concern" over his physical and mental well-being, the *Clewis* court concluded that the statement ultimately obtained was not voluntary.

In *Greenwald* the Supreme Court, after finding that the prisoner's request for counsel was ignored, that his needs for "food, sleep and medication" were not met and, finally, noting "a lack or inadequacy of warning as to constitutional rights," the Court concluded:

"Considering the *totality of these circumstances,* we do not think it credible that petitioner's statements were the product of his free and rational choice." (Emphasis supplied.)

390 U.S. at 521, 88 S.Ct. at 1154.

◼ Mr. Lafferty's situation when he personally wrote the statement and then explained its meaning to the officer was hardly comparable to the facts in either *Garrity, Clewis* or *Greenwald.* The Justice below had evidence from which he could find that appellant had been lawfully arrested; prior to any questioning he had been informed of his constitutional rights and had acknowledged to the officer his understanding thereof; the questioning began at 2:35 a. m. (only two hours subsequent to his arrest) and lasted only thirty

minutes; there was no evidence of force or duress; at his request he was allowed to place a long distance phone call to his mother; he then wrote the confession; he showed no evidence of any incapacity; the only emotion he demonstrated was a brief period of crying when told that his wife was dead, which preceded the police interrogation.

Applying the "totality of the circumstances" rule to these facts, it is clear that the record fully supports the conclusion of the Justice below that the statements were voluntary.

### Trial Errors

The appellant seasonably objected to the formal admission into the record of the clothing, hunting knife and blood scrapings taken by the police, as well as his own statements. Since the same evidence was introduced before the jury as that at the prior suppression hearing, the constitutional argument against admission reiterated at the time of trial need not be discussed further.

Appellant also contended at trial that the physical evidence should not be admitted because the State had failed to prove properly the necessary continuity in the handling of these exhibits.

The record is clear that all physical exhibits were traced directly from a common source to an appropriate official at the headquarters of the Maine State Police. This official personally packaged the exhibits and sent them by registered mail to the Federal Bureau of Investigation on May 24, 1971. There the package was received intact by an expert in forensic serology on May 27, 1971. Registered mail receipts were admitted to support this testimony. In the same package in which they were sent the serologist, after conducting necessary tests, returned them by mail to the Maine State Police where they were received by the identical officer who had originally packaged and transmitted them to the Federal Bureau of Investigation. This officer produced the exhibits and the package at the time of trial.

■ There is no suggestion in the record of any careless handling of the exhibits by anyone or that the exhibits had been tampered with in any way. There is no doubt that the tests made by the forensic serologist were conducted on these precise exhibits.[4] There has been no showing of any break in continuity, unless the use of the mails, *per se*, can be so characterized.

■ Appellant argues that the serologist's testimony is inadmissible because "there are missing links in the chain of evidence of identity of blood specimens." State v. Foster, 198 Kan. 52, 422 P.2d 964 (1967) is cited to support this argument. In that case, however, the "chain of evidence connecting the defendant with the blood sample breaks with the posting of the sample" because no laboratory personnel testified as to what was done after its receipt. Here, the serologist actually received the exhibits, personally conducted

4. We note that the relevance of the testimony (analysis of blood found on the hunting knife and the car door indicating that both were type "O" human blood) was to add an additional circumstance that the jury might consider since it was properly established that Mrs. Lafferty's blood also was type "O." The State was not attempting to prove scientifically that the blood taken from the exhibits was that of the decedent but only to offer evidence which, combined with other proven facts, might allow the jury to draw that inference, and conclude that appellant had killed his wife by stabbing her. In view of appel-

lant's own admissions this testimony becomes of minor significance. He testified that he carried a knife "in my back pocket," that he said to his mother, "I stabbed Teresa"; that after the episode "I did't have the knife," and that "I had spots of blood all over my face. My hand was covered."

We note likewise the testimony of Mr. and Mrs. Beaulieu, the occupants of the apartment at 17 Elliot Street, with whom the appellant stayed. Between 11:00 and 11:30 p. m. this appellant entered the apartment. His hands appeared bloody and, referring to his wife, he said, "I think I stabbed her."

the tests, identified the exhibits as those tested, and testified before the jury. The case is not in point.

■ We recognize that the use of the mails is an acceptable means of prudently conducting many of the important transactions in our society. If such use was not so recognized and personal delivery of important materials and documents was mandated in order to prove prudence and due care by the business community, our economy would be stifled. While we recommend personal handling of exhibits in criminal cases when the circumstances reasonably permit, we do not feel inclined to adopt the *per se* rule appellant urges upon us. *See* Pasadena Research Laboratories v. United States, 169 F.2d 375, 381 (9th Cir. 1948).

We need not give elaborate treatment to the claim that Mrs. Lafferty's statement made as she lay in obvious pain bleeding from twenty-three stab wounds within minutes after the episode was improperly admitted.

■ The State offered the statement not only as a dying declaration but also as part of the *res gestae*. It is true that no preliminary hearing on admissibility was had and none was requested. However, the essential facts were already in the record upon which the ruling was based. At a bench conference *out of the hearing of the jury*, the Justice below had clearly indicated his position, and this was *prior* to admitting the decedent's statement. The appellant demonstrates no prejudice from this procedure.

■ That the ultimate statement of the decedent was admissible as either a dying declaration or part of the *res gestae* was settled by our recent holding in State v. Chaplin, 286 A.2d 325, 328 (Me.1972). Note the startling comparison between the facts here and those in *Chaplin*.

"As already noted Mrs. Chaplin was half led and half carried from her home by the defendant and placed in a reclining position on the lawn. She was bleeding profusely and was suffering mental and physical anguish from the wound she had just received. During the very short period she remained there before the arrival of an ambulance, she made certain statements, the most significant of which were addressed to her husband who remained kneeling beside her. These statements were admitted as dying declarations by the Court. Later in this opinion we will have occasion to discuss the rules applicable to such declarations. Suffice it to say that these declarations were admissible not only as dying declarations, the declarant giving every evidence of her knowledge of impending death and the hopelessness of her case, but also [on] other independent grounds. Mrs. Chaplin's utterances on this occasion, following so soon after her traumatic experience as to form a part of it and to negative any opportunity or purpose to fabricate evidence, were admissible as part of the res gestae. . . . ."

Id. at 328.

We have examined other claimed trial errors and find them to be without merit.

### Claimed Errors in Jury Instructions

Appellant now asserts four errors arising from the instructions to the jury, although only one objection was formally made at trial.

The evidence was concluded at 5:58 p.m. on October 22, 1971. The Justice below then stated: "[I] would request that counsel furnish the Court, in writing, any instructions that they may wish to have considered before argument tomorrow morning." The next day after counsel for the State had argued, the Justice stated:

"THE COURT: Now, for the record and before the completion of final argument, the Court would like to say that the instructions that the Court

will give in this matter have been discussed at length with counsel in chambers, that numerous requests for instructions have been made by counsel for the State and counsel for the defendant, that insofar as practicable, the Court has endeavored to incorporate these requests into the instructions which will be given, other than in instances of where the instructions would be repetitive for the most part.

. . . . . .

MR. FRIEDMAN: Your Honor, the instructions that I requested in chambers have been granted by your Honor.

THE COURT: Thank you."

Defense counsel then made his closing argument, following which the Justice below delivered his instructions to the jury, concluding with this language:

"As you can see from the instructions I've given you, you have three possible verdicts: not guilty, number two, guilty of murder, number three, guilty of manslaughter. Your verdict must be one of those three verdicts."

The record next discloses this colloquy and additional instruction:

"[THE COURT]: Do counsel have any additions or corrections?

MR. FRIEDMAN: May we approach the bench?

(The following bench conference was held out of the hearing of the jury.)

MR. FRIEDMAN: I think it was probably a slip of the tongue, but in defining the burden on the defendant in the event of reducing the offense from murder to manslaughter, you first started by saying that this burden is not necessarily beyond a reasonable doubt and then you went on to explain about the preponderance of the evidence, and I'm wondering whether the jury might not be confused by this . . . that is, if anyone picked it up.

. . . . . .

MR. FRIEDMAN: I would like to make an objection for the record on the instruction involving what constitutes an intervening cause between the act of the defendant and the resulting death of the deceased.

THE COURT: Anything else?

MR. DAWSON: No.

MR. FRIEDMAN: No.

(The case was continued within the hearing of the jury.)

THE COURT: I have been asked to give one additional instruction . . . .

. . . . . .

And . . . in regard to the degree of persuasion which the defendant must carry if he would attempt to reduce the offense from murder to manslaughter, and, as indicated to you, he has to persuade you of three things: that the killing was done in the heat of passion, that it was done on sudden provocation as defined to you previously, and that it was done without malice, expressed or implied. And, the degree of persuasion that is required is that he satisfy you by a fair preponderance of the evidence, which I explained to you before.

But, let me repeat that first of all, and above all, and throughout, the burden is on the State to satisfy you before there can be a verdict of guilty of any crime here, to satisfy you beyond a reasonable doubt that the defendant here unlawfully killed Teresa Lafferty. If you don't find that, if you are not satisfied as to that beyond a reasonable doubt, your verdict will be not guilty.

Is there anything further?

All right."

Although no objections were noted following the instructions to the jury, appel-

lant now argues that instructions relating to the admissibility of dying declarations and statements admitted under res gestae rules were erroneous. Under similar conditions he also argues that the Justice below failed to instruct the jury properly "on the issues of voluntariness of admissions and confessions."

Rule 30(b), Maine Rules of Criminal Procedure, provides:

"(b) Instructions. At the close of the evidence, or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to the adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. *No party shall assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.* Opportunity shall be given to make the objection out of the hearing and presence of the jury." (Emphasis supplied.)

Rule 52(b), M.R.Crim.P., provides:

"(b) Obvious error. Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

■ We limit our initial comments to these belatedly advanced arguments. Our study of the treatment by the Justice below

of these issues reveals that no substantial rights of the appellant were affected by the instructions given on these points.[5] Since our holding in State v. Collins, 297 A.2d 620 (Me.1972), makes it clear that the jury has "no function" regarding the admissibility of a confession,[6] appellant actually received a more favorable instruction than was required. We hold, therefore, since submitting the issue of admissibility to the jury did not affect any substantial right of the appellant, and because there was a failure to comply with Rule 30(b), these points were not properly preserved for appellate review.

We next consider the instruction on causation to which objection was seasonably noted. The jury was told:

"[T]he State must prove beyond a reasonable doubt that Teresa Lafferty died as a result of some act of the defendant. This is essentially cause and effect. Did some act of the defendant cause her death? There has been some suggestion that there might have been, or there may have been another cause of her death or that no act of the defendant was the cause of her death. I've been asked to read what is said to be the common law rule which is that, 'The wrongdoer is not excused if the victim dies because the attending physician was negligent, unskilled, or made a mistake.' This rule presupposes, however, the the [sic] injury of the victim was such that he would have died without any treatment in any case. And, I'm not, of course, in any way intimating that there was any negligence or neglect in the course of treatment, but I am suggesting to you that you do have the right to consider whether or not any act of the defendant was

5. In effect, the Justice explained the general rules concerning admissibility of both dying declarations and confessions to the jury and then instructed the jury to disregard either, or both, if it found a failure of compliance therewith. In short, the jury was told to pass on admissibility before giving consideration to such weight as it might give to either.

6. We see no reason, logically, to distinguish between the function of the Justice in ruling on the admissibility of dying declarations and his function in such rulings involving confessions, under the rationale discussed so fully in *Collins*. As to applying the same rationale to the corpus delicti rule, see State v. Kelley, Me., 308 A.2d 877 (Opinion July 31, 1973).

the effective cause of the death of Teresa Lafferty. If you find that it was not, if you find that her death was due to some unrelated and separate cause, then one essential part of the crime has not been proved beyond a reasonable doubt. But, I think you have a right to consider that if some act of the defendant set in motion a train of events, one flowing naturally from the other, which resulted ultimately in her death with no separate effective intervening cause—unrelated intervening cause, then you may, if you find that, you may find that some act did cause her death. And, again, this is entirely up to you. I'm only using the facts in this case as illustrations to show the applications of the rules I'm giving. You are the ones to decide whether or not any act of the defendant caused her death."

■ It should be observed that the evidence submitted on the cause of death was that of a qualified pathologist whose conclusion stands unchallenged, namely, that Mrs. Lafferty "died from acute blood loss as a result of multiple stab wounds." Although the doctor who treated Mrs. Lafferty at the hospital described his emergency treatment procedures in some detail, there was no testimony from any source critical of the methods he adopted. If the jury had found that "the attending physician was negligent, unskilled, or made a mistake," it would have been pure speculation. In other words, the jury would have been compelled to go beyond the record to conclude that some "unrelated intervening cause" produced her death other than fatal hemorrhaging from stab wounds. Since the instruction complained of went beyond that which the record required to be given, the appellant has no cause to complain.

We note, however, our holding in State v. Hachey, 278 A.2d 397, 401 (Me.1971) where death was the result of septicemia developed following a gun shot wound, namely:

"The law is well settled that a Defendant is responsible even where the act was not the immediate cause of death if an intervening cause was the natural result of the wrongful act. State v. Rounds (Vt.1932) 104 Vt. 442, 160 A. 249."

People v. Freudenberg, 121 Cal.App.2d 564, 263 P.2d 875, 888–889 (1953), recognized, as we do, the rule stated in 8 A.L. R. 516, as follows:

" 'When a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide.' "

The instruction actually given, although not required under the factual background here presented, was more liberal to the appellant than required. There is no basis to his objection.

The final point which must be considered under the points of appeal directed at the jury instructions is premised on the theory that constitutional due process was violated because the Justice below modeled his instructions [7] on our recent holding in State v. Wilbur, 278 A.2d 139 (Me.1971).

The seemingly contradictory position of appellant's counsel in now asserting that this instruction, although given as requested, is, in retrospect, an error of constitutional dimension and, therefore, reviewable under Rule 52(b), is understandable. At the time of appellant's trial the decision of the Federal Circuit Court of Appeals for the First Circuit in Wilbur v. Mullaney, 473 F.2d 943 (1973), holding that Maine law unconstitutionally placed the burden of proving an essential element of the homicide punishable as murder on a criminal defendant, had not been published.

■ We could well end our discussion on this point by observing that not only

7. See quoted excerpt, *supra* at 19.

was Rule 30(b) not involved but also the instruction as given contained neither an obvious error nor defect which affected any substantial rights of the appellant. He had no right to have the jury charged otherwise. In short, we adhere without reservation to Maine's traditional concept of "felonious homicide" as reviewed and reaffirmed in State v. Wilbur, and later in State v. Rollins, 295 A.2d 914 (Me.1972). We reject the conclusion reached in Wilbur v. Mullaney.

We deem it wise, however, to comment further because this is the first case which has reached us since the Federal Court decided Wilbur v. Mullaney. It would even then be sufficient to point to *Rollins,* observing that although the case preceded Wilbur v. Mullaney, the rationale therein refutes the position taken by the Federal Court.

▮▮▮▮ Nevertheless, we do not hesitate to express our firm belief that a state court of last resort is better equipped to interpret its own state law, provided it trespasses on no federally guaranteed constitutional rights in so doing, than is any Federal court. Additionally, under traditional concepts of federalism, a Federal court has no *right* to reject the rational interpretations given a state law under those circumstances by the highest appellate court of that state. While, as we view it, the decision in Wilbur v. Mullaney violates both of these well established precepts, we feel constrained to state our reasons therefor.

The Federal Court, in holding that murder and manslaughter are two distinct offenses, found it of controlling significance that the Maine Revised Statutes Annotated provides, in *isolated* sections, differing penalties for the felonious homicides punishable as either. An understanding of the statutory history of these two sections (17 M.R.S.A. §§ 2551 and 2651) clearly demonstrates the insignificance of sectional statutory arrangement.

Chapter Two of the Laws of Maine, approved *February 28, 1821,* in three *succes-* sive sections proscribed "wilful murder," being "an accessory thereto," and committing "the crime of manslaughter." R.S. 1841, ch. 154, in five *successive* sections, expressed in statutory language the common law definition of murder, provided the death penalty if "express malice" existed, for life imprisonment otherwise, and defined the homicide punishable as manslaughter in the classical language even now found in 17 M.R.S.A. § 2551. It was in the context of R.S. 1841, ch. 154, §§ 1 and 5, that State v. Conley, 39 Me. 78, 87 (1854), noted:

> "By the common law, *felonious homicide* is the killing of any human being without justification or excuse. . . . It [felonious homicide] is divided into manslaughter and murder." (Emphasis supplied.)

*Conley* clearly holds:

> "When a party is charged in an indictment with the crime of murder, *the felony actually committed is the same,* whether it has all the elements of murder . . . or whether it is wanting in the criterion of murder, and is therefore manslaughter only." (Emphasis supplied.)

*Id.* at 88. As illustrated by *Wilbur* and *Rollins,* the holding in *Conley* has been retained as the law of Maine in the intervening years. If, as Wilbur v. Mullaney suggests, the Maine Legislature would be shocked to learn that "felonious homicide," as a criminal concept, encompassed conduct punishable as either murder or manslaughter, it has withstood the trauma since 1854.

It is equally clear that when the 1964 Revised Statutes were annotated, no effort was made to do so in terms of generalizing concepts of criminal conduct in contiguous sections. Alphabetical listing was given priority. For example, 17 M.R.S.A. § 1 defines the crime of Abduction, which is followed by succeeding sections dealing with Abortion, Adultery, Arson, Assault and Battery, et cetera, and finally concluding

with sections on Treason, Trespass, Unprotected Wells and Miscellaneous Crimes. All one need observe to demonstrate the complete insignificance of the sectional arrangement found in our current Annotated Statutes is to revert to the immediate predecessor thereof, the 1954 Revised Statutes, and note that Chapter 130, §§ 1 and 8, dealing with the homicide punishable as either murder or manslaughter, used essentially the same language as did R.S. 1841, ch. 154, §§ 1 and 5.

■ The reliance in Wilbur v. Mullaney on the sectional arrangement of the Maine Statutes as a basis of attacking *Rollins* because we gave it "no recognition" results in an obvious response: Why should the completely insignificant sectional arrangement of the Annotated Statutes to serve alphabetical purposes, be given "recognition" as proof of a change in the legislative concept of felonious homicide? We deny the right of the Federal Court to interpret the rationale underlying the acts of the Maine Legislature contrary to the interpretation given by the Maine Supreme Judicial Court. We do not hesitate to hold that by authorizing the sectional arrangement of the 1964 Maine Revised Statutes Annotated, the Legislature did not intend to abrogate the concept of a felonious homicide, a viable part of Maine criminal law since it became a state.

The Federal Court seized upon State v. Merry, 136 Me. 243, 8 A.2d 143 (1939); Collins v. Robbins, 147 Me. 163, 84 A.2d 536 (1951); State v. Ernst, 150 Me. 449, 114 A.2d 369 (1955); and State v. Park, 159 Me. 328, 193 A.2d 1 (1963), to refute the holding in *Wilbur* and to demonstrate that, under these decisions, "murder" and "manslaughter" are separate and distinct crimes. Since the precise issue now before us was not present in any of these cases, we find it somewhat ironic that the Federal Court did not cite Brine v. State, 264

A.2d 530, 533 (Me.1970), where the jury instruction approved in State v. Knight, 43 Me. 11, 137 (1857), was reaffirmed, namely, "if the accused would reduce the crime below the degree of murder, the burden is on him to rebut the inference of malice which the law raises from the act of killing, by evidence in defense."

It was thus inappropriate for the Federal Court to conclude that *Conley* and *Knight* had been overruled by *Merry, Collins, Ernst* and *Park*. If it was proper to accuse the Supreme Judicial Court of Maine of attempting, in *Wilbur,* to make "an end run" around In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and in so doing with being "offside," [8] we might suggest that the failure of the Federal Court to discuss *Brine,* or even to recognize its current cogency (as *Wilbur* did), results in the "offside" call having been made against the wrong team.

Against such background and within the context of the overall import of Maine law, as ultimately expounded in *Wilbur* and reaffirmed in *Rollins,* it is a startling invasion of the function of a State's highest Court to be the final and controlling expositor of the content of the State's internal law that a federal court should (1) invoke the surface appearance of state statutes; (2) fix selectively upon the casual and imprecise language (at best dicta) in *Merry,* Collins v. Robins, *Ernst* and, most notably, *Park,* to make its own interpretation of the law of the State and conclude that by 1963, at least, the law of Maine had become *established* (contrary to what it had previously been) that *murder* and *manslaughter* were the names of two separate crimes rather than of degrees, for penalty purposes, of the single crime, *unlawful (felonious) homicide*; and (3) to take such approach on the basis of the federal tribunal's conception of the *true* content of Maine law in defiance of the ring-

---

8. "Before us *Wilbur* characterizes this analysis as an attempt to make 'an end run' around *Winship.* There is nothing wrong with an end run. The question must be whether in doing so the court went offside." 473 F.2d at 945.

ing endorsement given in 1970 in *Brine* to the *Conley* and *Knight* conceptions.

 Finally, Wilbur v. Mullaney adopted the false premise that Maine law unconstitutionally uses the presumption [of malice aforethought] as a device "to shift the burden of proof onto the defendant" of an essential element of the crime of felonious homicide punishable as murder. As we read the case, the Federal Court was of the impression that this crime includes, in addition to an intentional and unlawful killing, the independent element of "malice aforethought." Such is not, and never has been, the law of Maine. As we said in *Rollins,*

"the 'malice' (said to be 'presumed') is not a designation of any subjective state of mind existing *as a fact.* Similarly, the *'presumption'* (of 'malice') arising from the fact of an intentional killing is not a designation of any *probative* relationship between the fact of 'intention' relating to the killing and *any further facts . . . ."*

295 A.2d at 920.

The Federal Court overlooked Maine precedent which demonstrates the fallacy of the premise upon which its discussion of the *presumption* of malice aforethought was based.

State v. Turmel, 148 Me. 1, 88 A.2d 367 (1952) not only cites State v. Knight, *supra*, but explicitly negates the federal Court's identification of "malice aforethought" with "premeditation" when it says:

"Malice aforethought does not necessarily mean that there must be specific intent to kill . . . ." (p. 6, 88 A.2d p. 369)

In addition, by quoting from an early Massachusetts case, it reaches back to English common law for a statement emphasizing that objectively dangerous conduct, as differentiated from the subjective factor of "premeditation" may be productive of "malice aforethought":

" '[B]ut he who wilfully and deliberately does any act, which apparently endangers another's life and thereby occasions his death, shall, unless he clearly prove the contrary, be adjudged to kill him of malice prepense.' " (p. 7, 88 A.2d p. 369)

We do not understand In Re Winship to hold that, in order to prove guilt beyond a reasonable doubt the prosecution must not only so prove each essential element of the crime charged but also must negate beyond a reasonable doubt all mitigating circumstances, even those fully subjective in nature, knowledge of which can only exist in the mind of the accused. Wilbur v. Mullaney places such a burden on the State of Maine because it completely misconceives our traditional concept of "malice aforethought." In so doing, it installs itself as the final arbiter of the internal law of the State of Maine, not only in defiance of the Supreme Judicial Court of Maine, but with apparent disregard of the admonition in Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), which held:

"Only the [State] courts can supply the requisite construction [of a criminal statute], since of course 'we lack jurisdiction authoritatively to construe state legislation.' "

In the interest of clarity, we summarize our concept of "malice aforethought" as related to the crime of felonious homicide punishable as murder.

 Maine law does not rely on a presumption of "premeditation" (as Wilbur v. Mullaney assumed) to prove an essential element of unlawful homicide punishable as murder. Proof beyond a reasonable doubt of "malice aforethought" (in the sense of "premeditation") is not essential to conviction. Evidence of "premeditation", such as hatred, ill-will or malevolence, is properly admissible, not because the State must prove "premeditation" be-

yond a reasonable doubt, but because it is relevant and material as tending to prove beyond a reasonable doubt one circumstance, inter alia, which can make a killing unlawful. On the other hand, the failure of the State to prove "premeditation" in this context is not fatal to such a prosecution because, by legal definition under Maine law, a killing becomes unlawful and punishable as "murder" on proof of "any deliberate, cruel act, committed by one person against another, suddenly without any, or without a considerable provocation." State v. Neal, 37 Me. 468, 470 (1854).[9] *Neal* has been frequently cited with approval by our Court. *cf.* Bessey v. State, 297 A.2d 373 (Me.1972); State v. Wilbur, *supra*; State v. McCarthy, 256 A.2d 660 (Me.1969); State v. Doyon, 221 A.2d 827 (Me.1966); State v. Park, *supra*; State v. Duguay, 158 Me. 61, 178 A. 2d 129 (1962).

*Ruling on Motions for Acquittal and New Trial*

We do not overlook either the appellant's motion for acquittal or his motion for a new trial, both of which were correctly denied by the Justice below.

■ As indicated by our factual summary herein, the evidence in its totality was sufficient to support the verdict.

The appellant has also argued, in support of these motions, that he was "unlawfully induced" to testify because the State introduced evidence which was "the fruits of illegal arrest, seizures, searches" and "illegally obtained admissions and confessions."

In view of our holding herein to the contrary, this argument must fall.

The entry is:

Appeal denied.

All Justices concurring.

DUFRESNE, C. J., did not sit.

WEBBER, J., sat at oral argument but retired before the adoption of this opinion.

WERNICK, Justice (further concurring).

I agree fully with the opinion of Mr. Justice Archibald and join it.

I deem it beneficial to append additional comments concerning the constitutional issue precipitated by this Court's decisions in State v. Wilbur, Me., 278 A.2d 139 (1971) and State v. Rollins, Me., 295 A.2d 914 (1972) taken in conjunction with the decision of the United States Court of Appeals for the First Circuit in Wilbur v. Mullaney, 473 F.2d 943 (1973).

Maine juries have always been instructed in every criminal case that the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the crime with which the defendant is charged. In those criminal cases in which the defendant is accused of an unlawful homicide alleged to be punishable as "murder" Maine juries, for more than one hundred years, have been given the further charge:

> "In all cases where the *unlawful killing* is proved beyond a reasonable doubt, . . . if . . . the defendant,

---

9. That juries have been traditionally instructed on the meaning of "malice aforethought, either express or implied," is understandable. Prior to the adoption of our Rules of Criminal Procedure indictments for felonious homicide punishable as murder simply alleged that the defendant "did feloniously, willfully and of his malice aforethought kill and murder." Since the adoption of our Criminal Rules, the form promulgated pursuant to Rule 58 (Form 1) merely requires an allegation that such a killing be done "unlawfully and with malice aforethought." Notable in both forms is the *absence* of the word "intentional." Thus, so that juries would understand the legal significance of the language used in the indictments before them, presiding justices have explained the meaning of "malice aforethought, either express or implied" to clarify the requirement that the State prove beyond a reasonable doubt that the killing be an unlawful killing. *See* State v. Arsenault, 152 Me. 121, 124 A. 2d 741 (1956).

would reduce the crime below the *degree of murder,* the burden is upon him . . . to satisfy . . . by a fair preponderance of the evidence that . . . although he killed unlawfully, . . ., he killed in the heat of passion upon sudden [and adequate] provocation, . . .." (p. 944 of 473 F.2d) (emphasis supplied)

See: State v. Wilbur, supra.

By the combined import of its decisions in Brine v. State, Me., 264 A.2d 530 (1970); State v. Wilbur, supra, and State v. Rollins, supra, this Court, as the highest court of Maine, reaffirmed that even though the "Wilbur-type" charge places a burden of proof on the defendant as to the particular matter of the causative impact of heat of passion upon sudden, adequate provocation—thus to palliate "murder" to "manslaughter",—such approach has always been regarded by the law of Maine as logically consistent with the burden of proof reposing on the prosecution rather than as an avowed exception to it.

This view was deemed to have been adopted long ago under the rationale promulgated in State v. Conley, 39 Me. 78 (1854)—that "murder" and "manslaughter" are not separate and distinct crimes but different degrees, for penalty purposes, of the single generic offense of "unlawful homicide"—and by State v. Knight, 43 Me. 11 (1857) in which—relying upon Commonwealth v. Knapp, 9 Pick. (Mass.) 496; Commonwealth v. Knapp, 10 Pick. (Mass.) 477; Commonwealth v. York, 9 Met. (Mass.) 93 and Commonwealth v. Webster, 5 Cush. (Mass.) 295 [1]—the Maine Court had observed:

"(t)he doctrine enunciated in these instructions [the Wilbur-type charge] has been much examined by courts of the highest standing, and jurists of great respectability, within a few of the last

years. Uncommon learning, research, and power of ratiocination have been exhibited in support of the principle; and those who have denied its soundness have maintained the denial in arguments of distinguished ability and force. . . . The instruction is a doctrine of the English common law, of Massachusetts, . . .. It is not known to have been denied by courts of this state, but it has been expressly admitted, and the jury instructed accordingly by this court, sitting as a full court . . .." (39 Me. pp. 137, 138);

and it was then concluded:

"The instruction given, having the weight of authority in its support, and not having been satisfactorily shown to be erroneous, [as allegedly inconsistent with the ultimate burden of the State to prove every essential element of the crime] is sustained." (p. 138)

In Wilbur v. Mullaney, supra, the United States Court of Appeals for the First Circuit (First Circuit) decided that Maine's court of last resort had wrongly assessed the fundamental import of Maine law. It held the "Wilbur-type" charge to be, under Maine law, an outright exception to the "proof beyond a reasonable doubt" burden generally imposed upon the prosecution and concluded, therefore, that it presently violates the "due process" clause of the Fourteenth Amendment to the Constitution of the United States into which, under the decision In Re Winship, 397 U.S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970), has been absorbed the principle that the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the crime with which a defendant is charged.

It surely lies within the First Circuit's province, *should it accept at face value the law of Maine as the Supreme Judicial Court of Maine has interpreted it,* to de-

---

[1]. The Maine Court in State v. Knight could also have pointed explicitly to a further clarification advanced by Chief Justice Shaw, concerning the significance of what was said

by the Court majority in Commonwealth v. York, supra, as presented in Commonwealth v. Hawkins, 3 Gray (Mass.) 463 (1855).

cide that the policy objectives underlying *In Re Winship,* supra, demand that, however valid for other purposes, in the context of due process requirements concerning the allocations of burdens, and the quanta of proof appropriate, in criminal cases, the distinction between the facts essential to constitute a crime and the facts legislatively assigned in advance to bind a judge's sentencing discretion must give way; in short, that In Re Winship must be extended beyond its originally stated confines ("every fact necessary to constitute the crime") to encompass as well the facts material to the grades, or degrees, fixed within a criminal offense as advance legislative punishment categories.

 Were the First Circuit so to *decide,* I should accede to such decision. Even though only a decision of the Supreme Court of the United States on a federal constitutional question is precedentially controlling as the supreme law of the land upon state courts, I believe that in the interests of developing harmonious federal-state relationships it is a wise policy that a state court of last resort accept, so far as reasonably possible, a decision on a federal constitutional issue rendered by a United States Court of Appeals in the Circuit in which the State is situated.

In Wilbur v. Mullaney, the First Circuit in dictum expressed doubts about the constitutional validity of the "Wilbur-type" charge should the interpretation by this Court be taken on its own terms.[2] Its *decision,* however, rested on its repudiation of the interpretation of Maine law given by the State's court of last resort, and its assertion of its own interpretation of Maine law as being that "murder" and "manslaughter" are two separate and distinct offenses, differentiated by the pres-

ence, or absence, of "malice aforethought" conceived as a substantive factual reality.

Because it is also my firm conviction that harmonious federal-state relationships tend to be jeopardized each time a federal tribunal sees fit to reject the interpretation of state law afforded by the highest court of the State, to substitute its own interpretation of the law of the State as a means of arriving at a decision of a federal constitutional issue, and because, further, I am satisfied that in the particular instance of Wilbur v. Mullaney the First Circuit (1) has wrongly perceived the Maine law and (2) has, therefore, wrongly exercised federal authority, I cannot accept that decision as a precedent.

 While the issue is not free from doubt when the interpretation by the highest court of a State involves the State's *substantive* law, it may be assumed that in deciding an issue pertaining to the federal Constitution as precipitated by the substantive law of a State, a federal Court is not *absolutely* controlled by the interpretation of the state law made by the State's court of last resort. Cases in the Supreme Court of the United States suggest a range, very narrow indeed, but open nonetheless, within which a federal tribunal may be authorized, as the only way in which the integrity of federal constitutional protections may be preserved, to declare "unsupportable" or "untenable" the State law as interpreted by the State's highest Court.

It is requisite, therefore, for present purposes, that the contours of such federal authority be ascertained with a degree of definiteness. Wilbur v. Mullaney offers only the bald statement without citation of authorities, that

"a totally unsupportable construction which leads to an invasion of constitu-

---

2. The Court said: " . . . we do not wish to be taken as accepting the court's conclusion, had we agreed with its premise. . . . we . . . question whether a formula which imposed on the defendant a factual issue determinative of the length of sentence would be any more acceptable [under the federal Constitution] than when used to establish an element of the crime. . . . We need not . . . pursue this matter, but we must have grave doubts . . . ." (473 F.2d p. 948)

tional due process is a federal matter." (p. 945)

Research indicates that although almost all of the discussion by the Supreme Court of the United States in this context concerns State procedural law, three guiding principles have been indicated relative to the interpretation by the highest court of a State of the State's substantive law.

■ First, a sudden, new interpretation affecting the criminality of conduct by the State Court of last resort, not previously advanced or reasonably intimated, because it would thus be operative to deprive the defendant in the immediate case of fair warning of prohibited conduct, is, as such, an independent violation of federal "due process" and cannot be controlling on a federal tribunal responsible to preserve federal constitutional guarantees. Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); Douglas v. Buder, Judge, ─── U.S. ───, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973).

■ Second, if the totality of the circumstances surrounding the State Court's recent interpretation under scrutiny establishes that it is at odds with the fundamental spirit which has always pervaded the State's law, the federal tribunal may find that, in practical effect, the State Court has manipulated to evade federal constitutional guarantees, and it may reject such recent State Court interpretations thus to preserve the integrity of federal constitutional protections. See: McCoy v. Shaw, 277 U.S. 302, 48 S.Ct. 519, 72 L.Ed. 891 (1928); Ward v. Love County, 253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751 (1920); Cf. Williams v. Georgia, 349 U.S. 375, 75 S.Ct. 814, 99 L.Ed. 1161 (1955) (dissenting opinion of Mr. Justice Clark).

■ Third, in any event,—even if the State Court's recent interpretation be consistent with the basic spirit of the law of the State and the State Court is clearly acting in good faith and with intellectual honesty—if the law of the State uses concepts arbitrarily, or assigns to them significance contrary to standards of meaning properly cognizable as normative, a federal tribunal may reject the State Court's interpretation when acceptance of it will frustrate federal constitutional protections. See: Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938); Terre Haute and Indianapolis Railroad Company v. Indiana, 194 U.S. 579, 24 S.Ct. 767, 48 L.Ed. 1124 (1904); Enterprise Irrigation District et al. v. Farmers Mutual Canal Company et al., 243 U.S. 157, 37 S.Ct. 318, 61 L.Ed. 644 (1917). Cf. Williams v. Georgia, supra, (dissenting opinion of Mr. Justice Clark).

Overtones of all three of the aforesaid principles appear in the opinion of the First Circuit in Wilbur v. Mullaney, supra. Because, however, I remain convinced, after the most careful deliberation, that the First Circuit misapprehended the fundamental law of Maine and, in addition, manifested a strange conception as to what would be an arbitrary use of concepts according to the standards which should be normative, I cannot give to the decision in Wilbur v. Mullaney the weight which, ordinarily, I should like to give to a First Circuit decision on a federal constitutional issue.

Much of my thinking is already reflected by the opinion written by Mr. Justice Archibald. I add the following further comments.

In specific relationship to the approach of this Court in Collins v. Robbins, 147 Me. 163, 84 A.2d 536 (1951), the First Circuit, in Wilbur v. Mullaney, maintains that

"the distinction based upon ["murder" and "manslaughter" as] separate offenses figured importantly" (473 F.2d p. 946)

in this case insofar as the

"fact that they were separate offenses, the defendant being a . . . [juve-

nile], raised the jurisdictional questions the court was concerned with." (p. 946)

In Collins v. Robbins the jurisdictional issue for decision was the validity of the Superior Court's exercise of jurisdiction to sentence, as a criminal, a juvenile who had been indicted for "murder" and whose plea of guilty of "manslaughter" had been accepted and entered. The potential jurisdictional infirmity arose because statute provided that

"[j]udges of municipal courts . . . shall have exclusive original jurisdiction over all offenses, except for a crime, the punishment for which *may* be imprisonment for life . . ., committed by children under the age of 17 years, . . . ." (147 Me. p. 165, 84 A.2d p. 537) (emphasis supplied)

Under the conception advanced in State v. Conley, supra, as reaffirmed in State v. Wilbur and State v. Rollins, the single generic offense of "unlawful homicide", of which "murder" and "manslaughter" represent different degrees of seriousness for penalty purposes, would be, qua offense, a "crime" the punishment for which may be imprisonment for life. On such rationale the exclusive original jurisdiction of the judge of the Municipal Court acting as a juvenile Court would be inapplicable in any event to preclude the Superior Court's jurisdiction of the offense.

This ground of decision was not used, however, in Collins v. Robbins. Instead, the Court took the approach that once the jurisdiction of a Court had attached in terms of a state of affairs existing at the time it was invoked, jurisdiction will not be divested by the supervention of subsequent events—even if it be assumed that had such events existed at the outset, they might have prevented the jurisdiction from attaching.

■ In Wilbur v. Mullaney the First Circuit seizes on this fact—that in Collins v. Robbins the Court failed to employ the conception of "unlawful homicide" as a sin-

gle generic offense comprehending "murder" and "manslaughter" as degrees for penalty purposes—as strong indication that the Court must have disagreed with it. The mere statement of the argument, however, marks it a "non-sequitur." Manifestly, that a Court chooses to resort to one specific ground as the basis of its decision does not mean, in strict logic or by fair intendment, that an alternative ground of decision was avoided because it was thought erroneous.

The basic premise utilized by the First Circuit to establish the "unsupportability" of the "Wilbur-Rollins" interpretation of Maine law is:

"While the term malice aforethought is an amorphous one, and while it may not have any independent meaning in some other jurisdictions, the law of Maine conclusively gives it distinct significance." (473 F.2d p. 947)

As I comprehend the First Circuit's decision, that Court conceives the "distinct significance" given by Maine law to "malice aforethought" to be "the fact of premeditation." The First Circuit says explicitly:

"So long as . . . murder . . . [is] an intentional killing with malice aforethought, if the defendant does not agree to, . . . a *finding of premeditation,* . . . the burden must be upon the state to establish it." (p. 948) (emphasis supplied)

■ Immediately, it is of the utmost importance to clarify that, as utilized in *Wilbur* and *Rollins,* the term "intentional killing" signifies not only that the act from which a death results is "intended" (thus to be a voluntary act) but also that the actor had the actual specific subjective intention that his act should cause the death of another human being. Thus, *Wilbur* and *Rollins* were concerned with the situation in which the prosecution has produced evidence sufficient to show beyond a reasonable doubt a killing rendered unlawful by its "intentional" character—that the

perpetrator of the homicide had done it with the specific subjective intention that his action produce the death of another. As to such "intentional killing", unlawful by virtue of its "intentional" aspect, *Wilbur* and *Rollins* held that a further characterization of it as "with malice aforethought"—thus to render it murder, rather than "manslaughter"—adds no factual content essential to the criminality of the conduct.

In holding this proposition "unsupportable", the First Circuit—to the extent that it purports to meet the *Wilbur-Rollins* analysis on common ground—must be taken to maintain that a correct reading of Maine law is that "malice aforethought" signifies factual substance *over and above* the fact that defendant killed another human being with the specific subjective intention that death result. It is by identifying this additional substantive fact as "premeditation" that the First Circuit says that insofar as Maine law conceives of "murder" as

> "an intentional killing with malice aforethought, if the defendant does not agree to, . . ., a finding of premeditation, . . ., the burden must be upon the state to establish it." (p. 948)

We may leave aside whether, even if it were a correct hypothesis that "malice aforethought" signifies some independent, factual content, it would follow that the prosecution is constitutionally required to prove it beyond a reasonable doubt should the State assign it materiality not to define criminality but only to differentiate degrees of penalty severity—criminality being defined by other factors. It is the First Circuit's hypothesis which, plainly

and simply, is an incorrect evaluation of Maine law.

The key to a correct understanding of Maine law on this point may be found by addressing attention to the details of the process involved when heat of passion upon sudden and adequate provocation is operative to remove "malice aforethought" from a "criminal homicide", thus to have it punishable as "manslaughter" rather than "murder."

First to be considered is the situation in which the unlawfulness (criminality) of the homicide consists in the fact that defendant causes the death of another having a specific subjective intention that the death result from his conduct. Here, it has been the law of Maine, without question, that once the prosecution proves such specific subjective intention beyond a reasonable doubt, nothing else appearing, there is sufficient proof of a criminal homicide, punishable as "murder." Under Maine law such specific subjective intention can be present at all only if it is present as "premeditation"; it can come into being only as formed some instant, however fleeting, before volition is exercised.[3] Thus, in the law of Maine an "intentional" killing—i. e., a killing in which the actor has the specific subjective intention that death result from his act is, by definition, a "premeditated" killing.

In this context, the law of Maine holds that if the subjective intention to have death result is truly generated by heat of passion upon sudden, adequate provocation, the "unlawful" homicide is "without malice aforethought" and becomes

---

3. It is important to recognize that Maine law has never given special significance for any purpose, even when Maine had capital punishment, to one type of "premeditation"— namely, "premeditation" in the sense of "deliberation" or "planning", and in which the subjective intention to have death result has been turned over in the mind and given second thought and reflection, as distinguished from the "premeditation" constituted by an intention to have death result which comes into being as an impulse formed in a fleeting instant before volition is exercised. As to such distinction which is unimportant in Maine but which is often crucial in other jurisdictions, especially in relation to capital punishment, see the charge to the jury which was before the Supreme Court of the United States, and approved, in Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). See also: Austin v. United States, 127 U.S. App.D.C. 180, 382 F.2d 129 (1967).

(punishable as) "manslaughter" rather than "murder." This results, however, not because the causative effect of heat of passion upon sudden, adequate provocation eliminates the specific subjective intention. Rather, the subjective intention to have death occur is regarded as continuingly present and operative, but, *notwithstanding and in spite of this fact,* insofar as it is produced by heat of passion upon sudden, adequate provocation, the law makes a concession to a frailty attributable to the average human being. The law compromises. It does not entirely excuse the unlawfulness of the homicide. The homicide remains criminal, *precisely because of the continuing operativeness of the intention that death result;* but its blameworthiness is regarded as palliated, or reduced, because heat of passion upon sudden, adequate provocation has generated the subjective intention that death occur.[4]

 Unless this analysis be the accurate description of the process involved when heat of passion upon sudden, adequate provocation supervenes to palliate from "murder" to "manslaughter", there can be no adequate accounting for the recognition of the homicide as *unlawful,* i. e., as a *crime.* Heat of passion upon sudden, adequate provocation is not an independent, self-sufficient factor productive of criminality in a homicide. *Criminality already existing because of other factors,* it mitigates the blameworthiness of the criminality, but it is not itself a source of criminality. This has always, and undeniably, been the fundamental insight, and spirit, of the law of Maine.

 Hence, the view of the First Circuit that the law of Maine "conclusively" gives "malice aforethought" a distinct substantive factual content which is to be identified as "premeditation" is just not correct. Since it is the *continuing existence* of the specific subjective intention to have death result which confers the continuing character of *criminality* upon a homicide punishable as "manslaughter", "premeditation" always remains as a characteristic of "manslaughter" thus constituted. Yet, "malice aforethought" becomes eliminated by the causational effect of the heat of passion upon sudden, adequate provocation. Patently, it is a logical contradiction to identify that which has been *extinguished,* "malice aforethought", with that which has *remained,* the "premeditation", the subjective intention to have death result. "Malice aforethought", then, in this context of an "intentional" killing cannot be the substantive fact of "premeditation", as the First Circuit has mistakenly claimed.

This same analysis explains the true conception of Maine law, and exposes the inaccuracy of the First Circuit's approach, when it is applied to the other context in which, absent a specific subjective intention to have death occur, death is caused by conduct which objectively evaluated is characterized by a high death producing potential. Here, it is such objective tendency of the conduct, nothing else appearing, which renders the homicide, first, a criminal homicide and, second, punishable as "murder". If, however, this objectively "reckless" or "brutal" conduct is caused by

---

4. This remains true even when the specific subjective intention that death result might have first arisen as a design calculated, or planned, over an extended period of time. Here, the law of Maine recognizes that "manslaughter" may, nevertheless, be a possibility provided that the deliberative, reflected-upon intention to have death result, has been shown to have been broken. Should such interruption have occurred and a subsequent specific subjective intention to have death result be formed in a fleeting instant before volition,—the intention being generated by the heat of passion upon sudden, adequate provocation,—the homicide may be regarded as "manslaughter" rather than murder (for purposes of punishment). Unless the homicide occurs in this manner, however, it cannot be "manslaughter" since, so long as a *deliberative reflective* intention to have death result remains continuingly operative, the heat of passion upon sudden, adequate provocation lacks requisite causational effectiveness to produce palliation consideration and is no more than an irrelevant coincidence of the homicide.

heat of passion upon sudden, adequate provocation, the homicide remains criminal but becomes punishable as "manslaughter", because it is then deemed to be "without malice aforethought."

Manifestly, here, "malice aforethought" cannot be identified with "premeditation" since, by hypothesis, there is lacking a subjective intention to have death result.[5] Further, here, it is the objective character of the conduct insofar as it remains continuingly operative as a fact, notwithstanding that it was generated by heat of passion upon sudden, adequate provocation, which renders the homicide continuingly criminal rather than entirely excused. Yet, despite such persistence of the "recklessness" or "brutality" of the act, "malice afore-thought" is extinguished by the fact that heat of passion upon sudden, adequate provocation spawned the conduct in the context in which it occurred. With the objective high tendency of the conduct to cause death continuingly operative to confer "unlawfulness", but the "malice afore-thought" extinguished by the causational effect of heat of passion upon sudden, adequate provocation, it would be a logical contradiction to identify the *extinguished* "malice aforethought" with the *non-extinguished, continuingly present* "reckless" or "brutal" character of the conduct. Here, then, "malice aforethought", is identifiable neither with the nature of the conduct as "reckless" or "brutal" nor with "premeditation" (premeditation by hypothesis, never having been a factor).

■ The fundamental truth which emerges from the foregoing analysis is that the term "malice aforethought" is really another example (from among many) of the technique by which the common law sought to express, or justify, a public policy judgment. It would attach a transcendental, mystical quality and speak

of it *as if* it be a factual substantive reality, *even though it is not*. In the law of Maine "malice aforethought" is precisely such a fictional, metaphysical term of art. It capsulizes, as a shorthand code phrase, not any substantively real factual content but only the expression of the public policy judgment that homicides which are rendered criminal by being committed in a specific manner—either by the actor's having a specific subjective intention to have death result or by the high objective tendency of his conduct to produce death— have *attributed* to them the *highest degree* of blameworthiness for purposes of severity of punishment.

When, however, the actual subjective intention to have death result or the "reckless" or "brutal" conduct is generated by heat of passion upon sudden, adequate provocation, although the features yielding criminality persist to keep the homicide *criminal,* the public policy judgment (conceding to human frailty) *attributes* a *removal* of the *"high degree"* of penalty blameworthiness. The criminal homcide is "palliated" as to blameworthiness. This is the sense in which the criminal homicide becomes "without malice", thus to be subject to lesser punishment as "manslaughter."

It remains my strong conviction, therefore, that State v. Wilbur, together with State v. Rollins, correctly interpreted the fundamental spirit of the Maine law as it had been for more than one hundred years.

■ Those cases clarify that in the process, under Maine law, by which "murder" is, or is not, palliated to "manslaughter" the *factual* matters delineating criminality operate without relationship to the separate and independent factual matters affecting the higher, or lower, degree of blameworthiness for penalty purposes. When a homicide becomes criminal because

---

5. The language that the "reckless" or "brutal" conduct manifests "a heart void of social duty, and fatally bent on mischief" is a metaphorical, description of the objective tendency of the conduct and should not be thought, mistakenly, to import the existence of an actual subjective state of mind.

the person committing it has acted with a specific subjective intention to have the death of another result, or the conduct involved has objective tendency to be highly dangerous to human life, these factors *establishing criminality* make it neither more nor less probable in fact that the actor was, or was not, acting from heat of passion upon sudden, adequate provocation—the factor which is material to the degree of blameworthiness for penalty purposes. Whether there be such heat of passion upon sudden, adequate provocation is entirely a matter of *happenstance* relative to the other facts by which the homicide is rendered criminal. For this reason, once a homicide is proved criminal, the use of the word "presumption" to describe the process by which the criminal homicide may, or may not, happen to be palliated from murder to manslaughter can be confusing precisely because the word, "presumption", tends to suggest, wrongfully in this context, that a process of proving one fact from another fact is involved. As explained above, however, no such factual proof process is truly involved; the process is, rather, only one of *legal attribution* —the rendering of a public policy judgment concerning *the degree* of blameworthiness attaching, for purposes of penalty, to the otherwise independently existing criminality.

■ This approach in the law of Maine does not, as I see it, make an arbitrary use of concepts contrary to standards of meaning properly cognizable as normative. I find it remarkable, to say the least, that the First Circuit in Wilbur v. Mullaney has suggested such a distorted use of concepts in Maine law, as interpreted by *Wilbur* and *Rollins,* by adverting to lay public attitudes as a source of standards by which to evaluate the reasonableness of the technical and complex distinction between essential elements of a crime and advance legislative criteria designating differing degrees of blameworthiness for purposes of penalty. To argue, as does the First Circuit, that the "public" thinks of "mur-

der" as a "premeditated killing" can hardly provide the norm which should properly control whether the law of Maine is irrational in assigning to the concept of "murder" a more expansive connotation. Indeed, the law of Maine, traditionally, as the law of many other states, has regarded "murder" as embracing not only "premeditated" killings but also killings in which "premeditation" is absent but there has been conduct which, objectively evaluated, is deemed to have a high likelihood of causing death. Until Wilbur v. Mullaney, such approach has not heretofore been thought to be an arbitrary distortion of the proper meaning of concepts simply because it may not agree with the casual rudimentary conceptions involved in lay public attitudes.

Moreover, likewise unacceptable is the assertion by the First Circuit that it is not conceivable that the legislature of Maine (as, we may assume, any other legislature) "if asked to revise the present laws" would be willing to make all "unlawful homicides" a single generic offense within which are delineated different penalty degrees requiring that

"the sentence would vary, depending on whether the defendant . . . had not meant the result", (p. 946)

or depending on other specific circumstances delineated in advance by the legislature.

Far from such legislative approach being inconceivable, it has been the legislative pattern actually adopted in Louisiana since 1942 (LSA–R.S. 14:29 et seq.) and in the recent statutory revisions in New York in 1967 (N.Y. Penal Law §§ 125.00 et seq. (McKinney's Consolidated Laws of N.Y., c. 40) ; Oregon in 1971 (ORS 163.005) and Pennsylvania in 1973 (Purdon's Pennsylvania Statutes Annotated, Title 18 §§ 2501 et seq.) It is also the approach taken in the Proposed Special Draft, A.L.I., Model Penal Code (Article 210—July 30, 1962).

In light of all the foregoing considerations, and those expounded in the opinion

of Mr. Justice Archibald, I must decline to follow the First Circuit's decision in Wilbur v. Mullaney, supra. I remain convinced that *Wilbur* and *Rollins* provide a correct interpretation of the law of Maine as it has truly been for more than one hundred years. I believe, further, that the law of Maine in the context under evaluation has made a reasonable use of concepts according to standards properly cognizable as normative.

I deem myself precedentially bound, therefore, by the "Wilbur-Rollins" interpretation of Maine law until either (1) the Supreme Court of the United States sustains the approach of the First Circuit in Wilbur v. Mullaney as properly within the authority possessed by a federal Court to preserve the integrity of federal constitutional guarantees, or (2) the First Circuit, or the Supreme Court of the United States, accepting the "Wilbur-Rollins" interpretation of Maine law on its own terms, decides that *In Re Winship,* supra, has broadened applicability to require the prosecution to prove beyond a reasonable doubt not only "every fact necessary to constitute the crime . . . charged" but also every fact necessary to constitute the subsidiary penalty degrees prescribed by the legislature as a prior limitation upon the sentencing discretion of judges.

I am authorized to state that all of the Justices sitting concur in this concurring opinion.